NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0382n.06

No. 11-2353

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SUZANNE LANGDON, as the Personal )
Representative of the Estate of CALISTA )
SPRINGER, deceased, )
)
    Plaintiff-Appellant, )
)
v. )
)
PATRICIA SKELDING, CYNTHIA BARE, )
MARIANNE UDOW, LAURA CHAMPAGNE, )
and TED FORREST, )
)
    Defendants-Appellees. )
    _____ )

**FILED**
*Apr 17, 2013*
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF
MICHIGAN

OPINION

Before: DAUGHTREY, KETHLEDGE, DONALD, Circuit Judges.

BERNICE B. DONALD, Circuit Judge. Plaintiff-Appellant Suzanne Langdon brought a § 1983 action against several state employees alleging that they violated the due process rights of Calista Springer, a minor, by failing to protect her from known, ongoing abuse that led to Calista's death. The district court dismissed the claims against all defendants on the grounds that Langdon has not alleged a viable due process claim and that the defendants were entitled to qualified immunity. For the following reasons, we affirm.

## I. BACKGROUND

In 2008, seventeen-year-old Calista Springer died of asphyxiation when she was unable to escape a house fire because her father and step-mother, Anthony and Marsha Springer (or "the Springers"), had chained her to a bed.[1]  Prior to this incident, the St. Joseph County Child Protective Service ("CPS"), a division of the State of Michigan Department of Human Services ("MDHS"), had developed an extensive record on Calista that dated back to 1995 when Calista was three-years-old.

CPS received many child abuse complaints concerning Calista over the years.  The earliest were two complaints in 1995 that she had extremely high levels of lead in her blood and that the Springers were not responding to preventative treatment for the lead poisoning.  CPS received another two complaints in 1997, one alleging that Anthony hit Calista in the face giving her a bloody lip, which Marsha confirmed, and one that Calista had untreated second-degree burns and that Marsha had hit her in the face and given her a bloody nose because Calista stuck out her tongue.  In 1999, an employee of Michigan's Community Mental Health Services reported that Calista was being restrained to her bed, a chair, or a pole in the kitchen by means of a belt or ropes.[2]  In 2000,

---

[1]Anthony and Marsha Springer were both convicted of torture and first-degree child abuse. *See People of Mich. v. Anthony John Springer*, Michigan Court of Appeals Docket Sheet, Case No. 298386, Entry No. 2; *People of Mich. v. Marsha Anne Springer*, Michigan Court of Appeals Docket Sheet, Case No. 298385, Entry No. 2.

[2] There are numerous, albeit vague, references in the pleadings suggesting that Calista suffered from an unspecified emotional and/or mental impairment.  A CPS worker speculated that Calista might have schizophrenia or autism.  The extent of this impairment is unknown.  The Springers maintained that they restrained Calista at night for her own safety, insinuating that her impairment made her a danger to herself.  This information is not critical to the analysis of the issues on appeal.

a school official twice reported that Calista had bruises, was kicked by Anthony, and that she was being locked in her bedroom at night, forcing her to wet the bed. In 2001, someone complained that Marsha was mentally abusing Calista by threatening to put her in foster care and by saying she hoped Calista would die. After each complaint, CPS rejected the case for further investigation.

Finally, in 2004, a series of three complaints triggered an investigation. A teacher, a deputy, and a neighbor all filed complaints alleging that Calista was chained to her bed at night, that she went days without eating, that Marsha assaulted her and slammed her head into the floor, and that Marsha would not let her bathe or use hygiene products. CPS investigator Patricia Skelding interviewed Calista and her sister Courtney, both of whom confirmed that Calista was being chained to her bed, and Calista sought Skelding's help. Skelding did not investigate the chains, but warned the Springers that they would present a danger in case of a fire. Skelding found that there was "insufficient evidence to prove neglect or abuse" and closed the investigation with the approval of her supervisor, Cynthia Bare. She noted that she could "only hope" the restraints were "necessary for [Calista's] own protection," but she also expressed that she was "uncomfortable" with Calista's treatment and that Calista was an easy target for abuse because she was not "believable or credible." She also noted that she did not think Calista "made up the story about [Marsha] pulling her head up by the hair."

The last known report was filed in 2005. A school official reported that Calista was still being chained to her bed and beaten, that she was not being fed, and that she wore the same clothes to school for days at a time. Bare spoke to a school counselor who told her that this was the "same

old story" in which Calista was "seeking attention" and Bare rejected the case for further investigation. That same year, the Springers removed Calista from public school in favor of home-schooling. Calista's home caught fire in 2008, and indeed, she died while chained to the bed.

On October 7, 2010, Suzanne Langdon, Calista's grandmother, filed a § 1983 complaint against Patricia Skelding and Cynthia Bare; Marianne Udow, the former Director of the MDHS; Laura Champagne, former MDHS Chief Deputy Director; and Ted Forrest, manager of the State of Michigan Child Protective Services Program.[3] The complaint alleges that the defendants violated Calista's substantive and procedural due process rights by "fail[ing] to properly investigate the complaints of abuse and fail[ing] to follow the mandates of the clearly established law, including MCL 722.638 of the Child Protection Act," leading to Calista's death.

The defendants filed a motion to dismiss, or, alternatively, for judgment on the pleadings. On September 30, 2011, the district court granted the motion to dismiss, finding that Langdon had not alleged viable due process claims and the defendants were entitled to qualified immunity. Langdon filed a timely appeal.

## II. Standard of Review

Whether the district court's decision amounts to a dismissal under Rule 12(b)(6) or a judgment on the pleadings under Rule 12(c), we review both de novo. *Handy-Clay v. Memphis*, 695

---

[3]The Appellant's brief states that CPS was also a defendant in the present case, but the complaint and the district court opinion do not bear this out.

F.3d 531, 538 (6th Cir. 2012); *Smith v. Salem*, 378 F.3d 566, 570 (6th Cir. 2004). At this stage, we must accept the plaintiff's factual allegations as true and determine "whether [she] undoubtedly can prove no set of facts in support of [her] allegations that would entitle [her] to relief." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). Although we must read the complaint generously, the plaintiff must allege more than mere labels and conclusions; "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Likewise, while we are required to accept as true all well-pleaded facts, we do not accept as true legal conclusions couched as factual allegations. *Id.* at 556-57.

### III. Analysis

Section 1983 provides a federal cause of action against anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The threshold requirement for a § 1983 claim is that the plaintiff must have been deprived of some right that originates in federal statutory or constitutional law. *Lewellen v. Metro. Gov't*, 34 F.3d 345, 347 (6th Cir. 1994). The rights allegedly violated here are Calista's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.[4]

---

[4]There was some discussion at oral argument about whether we should decline to reach the merits of these claims because of a prior ruling in the Michigan Court of Claims on Langdon's parallel state claims. *See Estate of Calista Springer*, No. 10-000103-MM (Ingham Cnty. Ct. Jan. 26, 2011). In Langdon's appeal, however, the Michigan Court of Appeals made clear that the Michigan Court of Claims does not have jurisdiction over the parties in their individual capacity. *Estate of Braman*, 2012 WL 676393, at *4 (Mar. 1, 2012) (affirming Court of Claims decision). Thus, the present due

The doctrine of qualified immunity shields government officials from liability "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We have the discretion to decide whether to address qualified immunity or the underlying claim of a constitutional deprivation first, considering the circumstances of the particular case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. As interpreted by the courts, the Due Process Clause protects substantive due process, which is the right to be free from government infringement against certain liberties such as personal security regardless of the process used, as well as procedural due process, which is the right to a fair procedure when the government deprives a person of protected liberties. *EJS Props., LLC v. Toledo*, 698 F.3d 845, 855 (6th Cir. 2012); *Kallstrom v. Columbus*, 136 F.3d 1055, 1062-63 (6th Cir. 1998). Langdon alleges that a violation of both occurred when the defendants failed to follow state law to properly investigate the complaints of abuse and that Calista's death would have been avoided if the defendants had fulfilled their duty to protect Calista from abuse and neglect.

---

process claims against these individuals could not have been brought in the Michigan Court of Claims and res judicata does not apply. *See Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004) (holding that Michigan claim preclusion applies only when the present claim could have been brought in the earlier action); *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) (holding that a federal court must apply state preclusion law to determine whether a present claim is res judicata).

## A. Substantive Due Process Claim

Nothing in the Due Process Clause requires a state to protect citizens from invasion against personal security by private actors. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Nor does it impose an affirmative obligation on states to render aid. *Id*. at 195-96. The purpose of substantive due process is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id*. at 196. This, of course, means that there may be no recourse against the government in circumstances as tragic as those presented here.

In *DeShaney*, a four-year-old child was severely beaten and rendered comatose by his father after local officials had received complaints of abuse but had decided not to remove the child from his father's home. *Id.* at 191-93. The Court held that the plaintiff had not alleged a due process claim against the local officials because the Due Process Clause is "a limitation on the State's power to act, not . . . a guarantee of certain minimal levels of safety and security" or a right of government aid. *Id.* at 195-96, 203. Therefore, the Due Process Clause does not create a claim against a state for injuries that might have been averted if it had voluntarily chosen to provide government aid. *Id*. at 196-97.

This court, however, has recognized a "state-created-danger" exception to the *DeShaney* rule in which a state may be held liable under the Due Process Clause when the state either creates or increases the risk that a person will be exposed to private acts of violence. *Kallstrom*, 136 F.3d at 1066; *see also Ewolski v. Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002). To establish a violation,

the plaintiff must do more than show a causal connection between the state action and the private act of violence or negligence; she must identify an affirmative state action that is so egregious as to be "arbitrary in the constitutional sense" and "shocks the conscience." *Ewolski*, 287 F.3d at 510. To state a claim under the state-created danger theory, a plaintiff must allege:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright v. Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Langdon argues that the state-created-danger exception applies here because the dangers to Calista were so obvious that the defendants' failure to act reflects deliberate indifference that increased the risk of harm.

We have explained that a failure to act does not satisfy the affirmative-act prong. *Cartwright*, 336 F.3d at 493. For example, while releasing private information *is* an affirmative act, failing to remove a child from a foster home is an not affirmative act under the state-created-danger exception. *Id*. (citing *Kallstrom*, 136 F.3d at 1067; *Reed v. Knox Cnty. Dep't of Human Servs.*, 968 F.Supp. 1212, 1220-22 (S.D. Ohio 1997)). Our disposition in *Cartwright* further explains this point. There, the police picked up an intoxicated man who was walking along the highway to give him a ride and later left the man at a convenience store where they arrested a prisoner. *Id*. at 489. The intoxicated man was run over by a truck along the same highway an hour later. *Id*. We held that this, too, was merely a failure to act. *Id*. at 493. "The question is . . . whether he was safer *before* the state action than he was *after* it." *Id*.

Here, we cannot say that the state took an affirmative action that made Calista less safe. Landon's allegations in the complaint that the defendants "made matters worse for Calista and increased the danger she was already subjected to by her parents" is conclusory and certainly cannot withstand a motion to dismiss. She argues on appeal that the defendants' decision to close the investigation in the face of such obvious dangers was an affirmative act that amounted to an endorsement of the Springers' private acts thereby emboldening them, but we are not convinced. The facts alleged merely show that the defendants did not do enough to investigate the complaints of abuse, and this is a mere failure to act. The Springers regularly chained Calista to the bed before the CPS investigation and continued doing so afterward. Nothing the state did increased the danger, so we are bound by our decision in *Cartwright* to conclude that the state-created-danger exception does not apply here. Dismissal of the substantive due process claim was proper.

**B. Procedural Due Process Claim**

The right of procedural due process only imposes procedural constraints when government decisions deprive a person of certain life, liberty, and property interests that are protected under the Due Process Clause. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To establish a violation, a plaintiff must show that (1) she had one of these protected interests; (2) she was deprived of this protected interest; and (3) the state did not afford her adequate procedural rights prior to depriving her of the interest. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Thus, as a threshold matter, Langdon must first establish that she—or in this case, the decedent, Calista—possessed a protected liberty or property interest. *Wojcik v. Romulus*, 257 F.3d 600, 609

(6th Cir. 2001). Only after identifying such a right do we consider "whether the deprivation of that interest contravened the notions of due process." *Id.*

Property interests are not created by the Constitution, but rather "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Baird*, 438 F.3d at 611 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *see also Wojcik*, 257 F.3d at 609. "[E]xplicitly mandatory language" is required to create such an interest. *Tony L. v. Childers*, 71 F.3d 1182, 1185 (6th Cir. 1995). Langdon argues that Michigan law imposes a mandatory duty on CPS employees to file a petition with the court once it concludes that a child is being abused, creating a property interest protected by procedural due process. The pertinent statute provides in relevant part as follows:

> (1) The department shall submit a petition for authorization by the court . . . if 1 or more of the following apply:
>
> (a) The department determines that a parent, guardian, or custodian, or a person who is 18 years of age or older and who resides for any length of time in the child's home, has abused the child or a sibling of the child and the abuse included 1 or more of the following:
>
> ***
>
> (iii) Battering, torture, or other severe physical abuse.

MICH. COMP. LAWS § 722.638 (2010). The provision that CPS "shall submit a petition" is mandatory language, but this does not complete our analysis.

*No. 11-2353*
*Langdon v. Skelding, et al.*

The Michigan statute mandates a process based on a substantive predicate, not a particular outcome. We have noted before that "[s]tate-created procedural rights that do not guarantee a particular substantive outcome are not protected by the Fourteenth Amendment, even where such procedural rights are mandatory." *Childers*. 71 F.3d at 1185. In *Childers*, we considered whether a similar Kentucky child-welfare statute created a protected interest in state action. *Id*. at 1185-86. The relevant provision read:

> Upon receipt of a report of an abused, neglected or dependent child pursuant to this chapter, the cabinet as the designated agency or its delegated representative shall initiate a prompt investigation, take necessary action and shall offer protective services toward safeguarding the welfare of the child.

*Id*. (quoting Ky. Rev. Stat. § 620.050(3) (1995)). We concluded that the statute "mandate[d] action based upon substantive predicates," but the statute did not create a protected interest because the statute granted only an expectation of a process, not a particular outcome. *Id*. "An expectation that some sort of action will be taken is not enough. Rather, a plaintiff must have an expectation that a particular result will follow from a particular, required action." *Id.*

Additionally, the substantive predicate is discretionary, not mandatory. For the mandatory language requiring CPS to file a petition with the court to apply, CPS must first make a finding that a parent has abused the child with "[b]attering, torture, or other severe physical abuse." MICH. COMP. LAWS § 722.638(1)(a)(iii). Michigan law does not define the terms "battering" or "torture," nor does it describe what conduct amounts to "severe physical abuse." MICH. COMP. LAWS § 722.622 (defining certain terms for the purposes of the child protection law). It merely defines

"child abuse," generally, as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment." MICH. COMP. LAWS § 722.622(f). The decision necessarily involves "a broad amount of discretion" just like that involved in *Childers*. 71 F.3d at 1186. As we noted there, property interests do not arise unless "a state places substantive limitations on official discretion."[5] *Id*. at 1185. Langdon expressly acknowledges that CPS made no finding of abuse, and, therefore, the mandatory provision was never triggered. Whether this panel would have found "insufficient evidence to prove neglect or abuse" is not relevant to our analysis. What matters is that CPS had the discretion to find none. Dismissal of the procedural due process claim was proper, and, as such, it is not necessary to reach the question of qualified immunity.

---

[5] There is a distinct, but analogous, line of cases analyzing procedural due process claims in the context of the alleged failure of police officers to protect victims of threatened or suspected acts of domestic violence. *See, e.g.*, *Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 749, 766 (2005) (holding that a state statute providing that "a peace officer shall arrest" a person whom he has probable cause to believe has violated a domestic restraining order does not give rise to a protected interest); *Estate of Smithers ex rel. Norris v. Flint*, 602 F.3d 758, 762 (6th Cir. 2010) (finding that "even assuming that the officers heard [suspect] make a threat, they had discretion not to arrest her on charges of domestic violence"); *Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) ("[S]eemingly mandatory statutes . . . and police discretion coexist frequently. Although calling for mandatory arrests ('shall'), the statute also requires the police officer to have 'reasonable cause' to arrest, which requires a police officer to exercise at least some discretion."); *Howard ex rel. Estate of Howard v. Bayes*, 457 F.3d 568, 575-76 (6th Cir. 2006) (holding that statute requiring police to "use all reasonable means to prevent further [domestic] abuse," up to and including arrest granted officers discretionary authority to arrest and, therefore, did not confer an entitlement protected by due process).

### III.  Conclusion

While this case is undeniably tragic, Langdon has not alleged facts that would establish that the defendants violated Calista's substantive or procedural due process rights.  Accordingly, the district court's dismissal of her civil rights complaint is AFFIRMED.