RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LEXON INSURANCE COMPANY,

　　　　　　　　　　*Plaintiff-Appellee,*

*v.*

AZIZ NASER,

　　　　　　　　　　*Defendant-Appellant.*

No. 14-1844

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-13218—Gershwin A. Drain, District Judge.

Argued:  March 5, 2015

Decided and Filed:  March 19, 2015

Before:  GIBBONS, SUTTON, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Kevin B. Hirsch, JAFFE, RAITT, HEUER & WEISS, PC, Southfield, Michigan, for Appellant.  Mark A. Rysberg, HILGER HAMMOND, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Kevin B. Hirsch, Brian G. Shannon, JAFFE, RAITT, HEUER & WEISS, PC, Southfield, Michigan, for Appellant.  Mark A. Rysberg, HILGER HAMMOND, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  Aziz Naser promised to indemnify Lexon Insurance Company for executing surety bonds on behalf of Michigan Orthopedic Services, LLC, a company he co-owned.  Although Naser signed the agreement twice—once as an officer of Michigan Orthopedic

1

Services and once as a co-owner—he maintains that he never became personally liable under it. The district court disagreed after a bench trial and entered judgment for Lexon. We affirm and along the way reject a jurisdictional claim that Naser filed an untimely notice of appeal.

I.

In 2009, Naser was the founder, co-owner, and chief executive of Michigan Orthopedic Services, a company that provides prosthetic and orthopedic services to Medicare recipients and other patients. The other co-owner was MOS Holdings, Inc., a private equity firm that held 80 percent of the company. In January 2009, new Medicare regulations required the company to obtain surety bonds for each of its billing locations. *See* 42 C.F.R. § 424.57(d). The co-owners submitted an application for surety bonds to Lexon Insurance Company.

Lexon responded with a one-page indemnity agreement for Naser and MOS Holdings to complete. The agreement said: "I agree to indemnify Lexon Insurance Company . . . in connection with any bond executed on behalf of the person or entity named as 'applicant' below." There were three signature blocks. The first appeared under the named "applicant": "Michigan Orthopedic Services, LLC." The last two appeared under the following text: "In consideration of the execution by the Surety of the bond herein applied for, the undersigned owners, jointly and severally, join the foregoing indemnity agreement. MUST BE SIGNED BY A CORPORATE OFFICER." One of these last signature blocks was for the "Authorized Corporate Officer" of "MOS Holdings." The other was for "Aziz Naser." R. 1-3 at 21.

Naser signed the first and third signature blocks—the first under the "applicant" section, the third under the "undersigned owners" section. A man named John C. Higgins signed the other "undersigned owners" signature block on behalf of MOS Holdings. Lexon issued the surety bonds in September 2009 and identified Michigan Orthopedic Services—the applicant— as the principal.

As fortune (and the onset of litigation) would have it, Michigan Orthopedic Services filed for bankruptcy on August 3, 2011.

Lexon turned to the "undersigned owners" for indemnification when the Centers for Medicare & Medicaid Services began issuing claims against its bonds. Lexon sent a letter to

Naser about the agency's claims, asking Naser to pay the $256,913.64 the agency requested. Lexon told Naser that he had a thirty-day window to pay the claims, 42 C.F.R. § 424.57(d)(5)(i), or to let the company know if for some reason the agency's claims were invalid. Rather than pay the claims or explain why they were invalid, Naser merely responded that the claims were false and that Lexon should not pay them.

Lexon paid the agency's claims. It then sued Naser in federal court for breaching the indemnity agreement. After a bench trial, the district court entered judgment for Lexon on April 16, 2014, finding Naser liable for breaching the agreement. On May 14, Naser filed a timely motion to amend the judgment. *See* Fed. R. Civ. P. 59(e). The next day, May 15, the court struck Naser's motion for being too long under the district court's local rules and gave Naser "seven days to file a revised motion." R. 67.

Naser complied with the court's order, revising his motion on May 21. The court denied Naser's motion on the merits on June 4, and Naser filed a notice of appeal on July 7.

## II.

We face a threshold jurisdictional question: Did Naser file a timely notice of appeal from the district court's April 16 judgment? Appellate Rule 4(a) requires parties to file a notice of appeal "within 30 days after the entry of judgment or order appealed from." The 30-day clock resets if "a party timely files in the district court" a motion to alter or amend the judgment under Civil Rule 59(e). Fed. R. App. P. 4(a)(4). In that case, "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." *Id.* A Rule 59(e) motion is "timely" if filed within 28 days of the entry of judgment, a deadline the district court may not extend. *See* Fed. R. Civ. P. 6(b)(2).

As Lexon sees it, the notice of appeal was due on June 16, not July 7. The company calculates this date by treating the original due date for Naser's notice of appeal as May 16—30 days after the April 16 judgment. Fed. R. App. P. 4(a). Naser extended his time when he filed a timely Rule 59(e) motion on May 14—28 days after the entry of judgment. *Id.* 4(a)(4); Fed. R. Civ. P. 59(e). But this was Naser's only "timely" Rule 59(e) motion, as the district court had no authority to extend the rule's 28-day deadline beyond May 14. Fed. R. Civ. P. 6(b)(2); *see*

*Bowles v. Russell*, 551 U.S. 205 (2007). As a result, Lexon argues, Naser's amended May 21 motion was untimely, and the court's June 4 order disposing of the untimely motion on the merits could not reset the 30-day clock. The only order "disposing of" a "timely" Rule 59 motion, Fed. R. App. P. 4(a)(4), Lexon reasons, was the May 15 order striking Naser's original motion as too long, giving Naser until Monday, June 16 to file his notice of appeal. *See* Fed. R. Civ. P. 6(a)(1)(C).

The day-counting premises of Lexon's arguments are correct. But one legal premise of them is not. The district court did not "dispos[e] of" Naser's timely May 14 motion in its May 15 order rejecting the motion as too long and giving Naser seven days to resubmit the (abridged) motion. A disposition is "a final settlement or determination." *Black's Law Dictionary* 572 (10th ed. 2014). To "dispose of" a motion, a court must act in a way that "indicates an intention that the act be final." *Campbell Indus., Inc. v. Offshore Logistics Int'l, Inc.*, 816 F.2d 1401, 1404 (9th Cir. 1987). The appeal time starts to run again in other words only after "the district court has finally acted on the tolling motion." 16A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 3950.4, at 391–92 & n.134 (4th ed. 2008). There was nothing "final" about the district court's May 15 order giving Naser seven days (and fewer words) to file an amended motion.

*Campbell* illustrates the point. The district court stated from the bench that it would grant a postjudgment motion to amend its findings and that the movant's counsel should prepare a "complete and full document to reflect the changes." 816 F.2d at 1402–03. Later that day, the clerk of court entered a minute order in the docket stating that the motion had been granted. *Id.* The district court, however, did not file its amended findings until two months later, after which the appellant filed its notice of appeal. The notice of appeal was late if measured by the minute order. But *Campbell* held—reasonably, in our view—that it was "clear that the district court's action," the initial entry of the minute order, "was not intended to be final." *Id.* at 1404. "Only when a judge acts in a manner which clearly indicates an intention that the act be final," the court explained, "does the time for appeal begin to run." *Id.* "Thus, the entry of the minute order did not finally dispose of the matter," and the notice of appeal was timely. *Id.*

A similar conclusion applies here.  Read most naturally, the May 15 order did not indicate that the court had finally disposed of Naser's Rule 59 motion but instead indicated that the court would review the motion when Naser "revised" it to comply with the district court's page-length rules.  R. 67; *see* E.D. Mich. Local Rule 7.1(d)(3)(A) (setting a 25-page limit for briefs supporting a motion but authorizing "[a] person seeking to file a longer brief [to] apply ex parte in writing setting forth the reasons").  The May 15 order thus lacked the requirements of finality integral to an order "disposing of" a motion.

Some conditional orders, it is true, may become final if the conditions expire or if an appellant disclaims any intent to satisfy them.  *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269, 275 (1991); *see, e.g.*, *Slayton v. Am. Express Co.*, 460 F.3d 215, 224 (2d Cir. 2006).  But nothing of the sort happened here.  Naser refiled his motion within the time provided and within the brief limits allowed, and the court later addressed the motion.  The court thus did not dispose of the May 14 motion until its June 4 order deciding the issues on the merits.

This analysis also respects Civil Rule 83, which warns that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."  Fed. R. Civ. P. 83(a)(2).  Heeding this warning, we rejected a claim that a Rule 59 motion filed on the last day of the 28-day period was untimely filed when plaintiffs' counsel used the wrong docket information to file the motion electronically.  *Shuler v. Garrett*, 715 F.3d 185, 187 (6th Cir. 2013).  Even though the filing failed to comply with a local rule of form—using the correct docket number—that error did not mean the document was untimely filed.  *Id.*  In similar circumstances, other circuits have accepted notices of appeal as timely filed even though they were rejected for not complying with local rules and even though they had to be re-filed after the expiration of Appellate Rule 4's immoveable deadline.  *See, e.g.*, *Klemm v. Astrue*, 543 F.3d 1139, 1143 (9th Cir. 2008) (accepting notice of appeal that was rejected for arriving by mail rather than electronically, contrary to local rules); *Contino v. United States*, 535 F.3d 124, 127 (2d Cir. 2008) (accepting notice of appeal that was rejected for arriving electronically rather than by mail, contrary to local rules); *United States v. Harvey*, 516 F.3d 553, 556 (7th Cir. 2008) (accepting notice of appeal that was rejected for arriving electronically rather than in electronic and paper form, contrary to local rules).  If a *brief* may satisfy the form

requirements of a notice of appeal under Appellate Rule 3, *see Smith v. Barry*, 502 U.S. 244, 245, 248–49 (1992), surely an unduly long motion and brief may satisfy the timing requirements of a Civil Rule 59 filing so long as they are resubmitted in proper form shortly afterwards.

Courts have even emphasized that papers "stricken by the district judge" for noncompliance with local rules "should remain filed" for purposes of Civil Rule 5(d)(4) and the Appellate Rules if the right to appeal would be lost otherwise. *NationsBank, N.A. v. Plecas*, 84 F.3d 1453, at *1 (D.C. Cir. 1996) (table); Fed. R. Civ. P. 5(d)(4) ("The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice."). Although this case involves a defective Rule 59 motion and not a defective notice of appeal, there is no good reason to treat them differently. In a case factually indistinguishable from this one, the Ninth Circuit concluded that a "Rule 59(e) motion, despite its technical noncompliance with Local Rule 7.4.1"—requiring a statement that the parties conferred prior to filing—"tolled the time for appeal until . . . the date on which the district court ruled on its merits." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 665–66 (9th Cir. 2003).

What of the reality that the district court, after realizing that Naser had attached an overlength brief to his motion, entered an order "striking" the motion on the last day of the 28-day period for filing a Rule 59 motion? Doesn't that action prohibit the motion from being resurrected after the period ends? This concern calls to mind a case in which our court did not heed the warning that the form requirements of Appellate Rules 3 and 4 should not be enforced at all costs without regard to whether the appellant has satisfied the function of them. In *Becker v. Montgomery*, our court struck an otherwise timely notice of appeal because the appellant had not complied with the "signature" requirement of Civil Rule 11 when he typed, rather than signed, his name on the notice of appeal. *Becker v. Montgomery*, No. 99-4190 (6th Cir. May 12, 2000) (unpublished). The Supreme Court reversed. 532 U.S. 757 (2001). It agreed that Becker should have signed the pleading. *Id.* at 763–64. But it disagreed that the consequence was to dismiss the appeal. Instead, the Court said, we should have accepted the filing and given Becker a limited amount of time to sign the pleading. *Id.* at 764–767. It then cited and quoted its own rule and practice for dealing with such matters, where "return[ing]" a pleading and asking the litigant to submit a proper pleading in terms of form within a set period of time becomes another

word for "striking" it. *Id.* at 767; *see* S. Ct. R. 14.5 ("If the Clerk determines that a petition submitted timely and good faith is in a form that does not comply with [rules governing document preparation], the Clerk will return it with a letter indicating the deficiency. A corrected petition submitted in accordance with [the rule governing filing of documents] no more than 60 days after the date of the Clerk's letter will be deemed timely."). Just so here.

In the final analysis, the district court did not resolve and dispose of the issues raised in Naser's May 14 motion until June 4. That gave Naser until July 7 to file his notice of appeal—30 days "from the entry of the order disposing of" his motion plus the July 4 weekend. See Fed. R. Civ. P. 6(a)(1)(C). Naser properly perfected his appeal.

III.

Unhappily for Naser, the strength of his claim on our power to review his appeal exceeds the merits of his appeal. Naser challenges the district court's conclusion that he signed the indemnity agreement on behalf of himself rather than as a corporate representative. The indemnity agreement, signed twice by Naser, imposes liability on multiple owners in their individual capacities, not in their capacities as corporate representatives of Michigan Orthopedic Services. Recall that the agreement said that Lexon would execute surety bonds on behalf of the "applicant," Michigan Orthopedic Services, for which Naser signed as "CEO." The agreement continued: "In consideration of the execution by the Surety of the bond herein applied for, the undersigned owners, jointly and severally, join the foregoing indemnity agreement. MUST BE SIGNED BY A CORPORATE OFFICER." An "Authorized Corporate Officer" of "MOS Holdings" signed below this text, as did Naser a second time. Rather than include any corporate title, Naser signed this second signature block with his social security number.

"[A]s a general rule, an individual stockholder or officer is not liable for his corporation's engagements unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice—once as an officer and again as an individual." *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140, 146 (Mich. Ct. App. 2007) (internal quotation marks omitted). Naser's second signature complies with this "universal practice." Naser offers no reason why he would sign the indemnification agreement twice if he did *not* intend to hold himself personally liable. Naser had no authority to sign on

behalf of MOS Holdings, which was owned by a private equity firm.  And it would be odd if Naser were signing on behalf of Michigan Orthopedic Services because the "undersigned owners" sentence indicated that the owners, "jointly and severally, *join*[ed]" the agreement with their signatures.  R. 1-3 at 2 (emphasis added).  Why would this section include a joint-and-several-liability phrase if Naser and MOS Holdings were signing on behalf of the single applicant?  And why would the agreement say the owners were "join[ing]" the agreement if Naser were signing on behalf of Michigan Orthopedic Services for a second time?  Naser has no satisfactory answer to either question, confirming the district court's conclusion that he signed the "undersigned owners" section on his own behalf.

Naser claims that parol evidence supports his position.  The first problem with this argument is that the district court, after a bench trial, did not find this evidence "credible."  R. 70 at 3.  The second problem is that the argument does not work on its own terms.  Naser points to affidavits saying that neither the officers of his company nor Lexon intended to hold an *officer* of Michigan Orthopedic Services liable under the agreement. R. 56-1 at 7–18; *see, e.g., id.* at 17.  Yet these same affiants declare that Lexon meant to hold the *owners* of Michigan Orthopedic Services liable.  *See, e.g., id.* at 13.  And in its application for an indemnity agreement from Lexon, Michigan Orthopedic Services certified that "Michigan Orthopedic Services is owned by MOS Holdings . . . 80%, Aziz Naser . . . 15%."  R. 21-15 at 5.

Because everyone agreed that Lexon planned to hold the owners of Michigan Orthopedic Services liable, and because the company certified to Lexon that Aziz Naser was one of its two owners, it makes sense that the agreement asked Naser to "join the foregoing indemnity agreement" as one of two "undersigned owners."  The district court's identical conclusion was therefore not clearly erroneous.  The certification also renders irrelevant the ancillary question of whether Naser sold all of his interest in the company prior to 2009—as some but not all of the parol evidence suggests.  *See, e.g.*, R. 56-1 at 7.  The only information Michigan Orthopedic Services gave Lexon regarding its ownership came from its certification listing Naser as a 15% owner.  Even if this listing was a mistake (and the district court did not believe it was, *see* R. 60 at 9), it was a unilateral mistake regarding a fact unknown to Lexon, which in Michigan is "not sufficient to warrant reformation" of a contract.  *Casey v. Auto Owners Ins. Co.*,

729 N.W.2d 277, 285 (Mich. Ct. App. 2006); *see Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000).

Naser adds that, even if he is personally liable to Lexon, the company should not have paid the claims of the Centers for Medicare & Medicaid Services without additional evidence of the claims' validity.  It is true that Lexon, as a surety, was not required to pay the agency under its surety bonds unless the agency supplied "sufficient evidence to establish the surety's liability under the bond of unpaid claims." 42 C.F.R. § 424.57(d)(5)(i).  But Naser's argument is an affirmative defense that Lexon paid the agency in "bad faith," a defense he forfeited by his failure to raise it in his first responsive pleading.  *See Jones v. Bock*, 549 U.S. 199, 212 (2007); Fed. R. Civ. P. 8(c).  The same regulation also required Lexon to pay the agency's claims within 30 days.  Yet when Lexon asked Naser for evidence that the claims were invalid, Naser declined to provide it.  R. 60 at 14.  The court's finding that Lexon did not act in bad faith is a distant cry from being clearly erroneous.

For these reasons, we affirm.