RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

KEVIN LIPMAN, Administrator of the Estate of
Ta'Naejah McCloud, Deceased; SHABRINA MCCLOUD,
            *Plaintiffs-Appellants*,

            *v.*

ARMOND D. BUDISH, in his official capacity as
Cuyahoga County Executive; CUYAHOGA COUNTY
CHILDREN AND FAMILY SERVICES; KRISTINA QUINT;
ADA JACKSON; MARQUETESE BETTS,
            *Defendants-Appellees*.

No. 19-3914

————————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cv-02985—Patricia A. Gaughan, Chief District Judge.

Argued: April 30, 2020

Decided and Filed: September 4, 2020

Before: COLE, Chief Judge; CLAY and NALBANDIAN, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Jay Paul Deratany, THE DERATANY FIRM, Chicago, Illinois, for Appellants.
Robert F. Cathcart, CUYAHOGA COUNTY, Cleveland, Ohio, for Appellees. **ON BRIEF:** Jay
Paul Deratany, Roosevelt Allen III, THE DERATANY FIRM, Chicago, Illinois, for Appellants.
Robert F. Cathcart, CUYAHOGA COUNTY, Cleveland, Ohio, for Appellees.

        CLAY, J., delivered the opinion of the court in which COLE, C.J., joined, and
NALBANDIAN, J., joined in part. NALBANDIAN, J. (pp. 37–39), delivered a separate opinion
concurring in part and dissenting in part.

———————

**OPINION**

———————

CLAY, Circuit Judge.  Plaintiffs in this case are the legal custodian and estate representative of Ta'Naejah McCloud, who was born in 2011.  Ta'Naejah was in the custody of her biological mother, Tequila Crump, who severely abused her, including through repeated burnings and beatings.  Ta'Naejah was hospitalized and interviewed by Cuyahoga County caseworkers, but ultimately was returned to Crump's custody.  Throughout the next year, the county received further reports of abuse and interviewed Ta'Naejah several more times, but never acted to remove her from the household.  The abuse eventually resulted in Ta'Naejah's death.

Plaintiffs filed suit under 42 U.S.C. § 1983, asserting claims based on Ta'Naejah's due process rights as well as several state-law causes of action.  In response, Defendants moved to dismiss, arguing that Plaintiffs' federal claims could not succeed because the Constitution does not create a right to state protection from private harm.  The district court agreed and also declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims, dismissing the case in its entirety.

On appeal, Plaintiffs challenge this ruling as well as the district court's decision to strike their motion to alter and amend the judgment, a decision based on Plaintiffs' failure to comply with a protective order governing confidential information obtained through discovery.  Defendants in turn moved to seal Plaintiffs' brief, saying that they again violated the same protective order by including information in their brief that they learned through depositions.  But Defendants do not explain why the information in question should be kept from the public, other than because it is covered by the protective order.

While several of Plaintiffs' federal claims are foreclosed by the Supreme Court's and this Court's case law, Plaintiffs also allege that the state affirmatively increased Ta'Naejah's risk of harm by repeatedly interviewing her about her abuse in the presence of her alleged abusers, in violation of state regulations.  Because these allegations plausibly allege a claim under the

state-created danger doctrine, the district court erred by dismissing Plaintiffs' complaint. Accordingly, we affirm in part and reverse in part the district court's order dismissing Plaintiffs' federal claims, vacate the dismissal of Plaintiffs' state-law claims, vacate the order striking Plaintiffs' post-judgment motion, and remand this case for further proceedings. We also deny Defendants' motion to seal.

## I. BACKGROUND

### A. Plaintiffs' Original Complaint

In December 2018, Plaintiffs Kevin Lipman and Shabrina McCloud filed their original complaint in the Northern District of Ohio. In that complaint, Plaintiffs describe a series of events that ended with the death of Ta'Naejah McCloud, a tragedy for which they say Defendants are responsible.

Ta'Naejah McCloud was born in Virginia in 2011. At the time, Ta'Naejah lived with Tequila Crump—her biological mother—and Shabrina McCloud, who also had legal custodial rights over Ta'Naejah. Ta'Naejah also suffered from a developmental disability.

In 2016, Crump and Shabrina McCloud separated. Following this separation, Crump took Ta'Naejah with her to Cleveland, Ohio, and moved in with her new girlfriend, Ursula Owens. This marked the start of a pattern of severe abuse by Crump and Owens against Ta'Naejah, a pattern that ultimately resulted in her death.

Starting in September 2016, social workers employed by the Cuyahoga County Division of Children and Family Services ("DCFS") and other Cuyahoga County employees were contacted by neighbors and medical providers, who reported the suspected abuse and neglect of Ta'Naejah. For example, Plaintiffs allege that in September 2016, a Cuyahoga County employee knew that Crump and Owens were burning Ta'Naejah. Similarly, in October 2016, reports were made to DCFS that Crump and Owens were burning and beating Ta'Naejah. But the county employees did not report this abuse as required by law, and even when it was made aware, DCFS failed to adequately investigate or refused to investigate at all.

On October 17, 2016, Ta'Naejah was taken to the hospital with third-degree burns on her hands, arms, and fingers. Crump and Owens claimed the burns were self-inflicted, but the hospital social worker reported to DCFS that the wounds were actually the result of abuse. Ta'Naejah was then transferred to another hospital's burn intensive care unit. The social worker there similarly reported to DCFS that the wounds could not have been self-inflicted and instead were caused by abuse. The burns required skin graft surgery, and the surgeon who performed the procedure also reported that the burns were not self-inflicted. This information was in turn provided to DCFS social worker Kristina Quint.[1]

During this stay in the hospital, Quint came to interview Ta'Naejah about her injuries. According to Plaintiffs, DCFS policy required Quint to interview Ta'Naejah alone, but instead, she conducted the interview in the presence of Crump and Owens—the two individuals suspected of committing the abuse. When asked about her injuries, Ta'Naejah said that she had gone to the bathroom with her mother and said she was scared of the hot water there. According to Plaintiffs, this contradicted some of Crump's statements, and for that and other reasons, substantially increased Ta'Naejah's risk of further abuse.

According to Plaintiffs, because the hospital had reported potential abuse, it could not discharge Ta'Naejah until directed to do so by DCFS. Plaintiffs thus allege that Ta'Naejah was not free to leave the hospital until DCFS acted, and so was effectively in its custody. But on October 21, 2016, Quint directed the hospital to discharge Ta'Naejah to Crump and Owens. Plaintiffs also say that Quint refused to further investigate these reports of abuse and failed to complete a proper investigation as required by Ohio statutes and regulations.

After Ta'Naejah was discharged from the hospital, DCFS received multiple other reports of abuse. According to Plaintiffs, none of these were investigated. In February 2017, though, a county social worker reported to DCFS that Ta'Naejah was being physically abused. Another case was opened, and Ada Jackson from DCFS was tasked with investigating the report.

While somewhat unclear, the complaint alleges both that DCFS refused to conduct this investigation, and also that DCFS took "co-custody" of Ta'Naejah during this time, meaning a

---

[1]During this admission to the hospital, DCFS also learned that Ta'Naejah was not enrolled in school.

DCFS caseworker would take her to medical examinations, including those to assess potential abuse. In any event, at one of these examinations, the physician concluded that Ta'Naejah was malnourished. A supervisor at DCFS—Marquetese Betts—"determined that the risk level for Ta'Naejah was high, took co-custody of Ta'Naejah and kept her case open." (Compl., R. 1 at PageID #8.)

On February 7, 2017, DCFS again took Ta'Naejah to a doctor. At this examination, for which Jackson was present, the doctor found multiple scars on Ta'Naejah's body and further signs that she was malnourished. Nevertheless, DCFS returned Ta'Naejah to Crump and Owens.

From February through March 2017, DCFS continued to receive reports that Ta'Naejah was being abused. On five different occasions, DCFS social workers went to Ta'Naejah's home and interviewed her in front of Crump and Owens, which Plaintiffs again say violated Ohio regulations and DCFS policy and placed Ta'Naejah at a heightened risk of harm.

During this period, Ta'Naejah suffered from serious abuse. Neighbors, family members, and others in the home witnessed Owens repeatedly beating Ta'Naejah and reported these events to DCFS. Ta'Naejah suffered a broken clavicle and multiple rib fractures during this time. And on March 16, 2017, Crump and Owens forced Ta'Naejah to scrub the floor with chemicals, the fumes from which caused her to lose consciousness for several hours. Plaintiffs say that DCFS either knew or should have known of these instances of abuse but refused to investigate them further and continued to place Ta'Naejah with Crump and Owens.

On the morning of March 17, 2017, Crump repeatedly struck Ta'Naejah, and then stood by while Owens hit her, threw her against the wall and dresser, threw her to the ground, and then stepped on and repeatedly beat her. Ta'Naejah became unresponsive, but Crump and Owens refused to call for help. When they finally did, approximately ten hours later, Ta'Naejah was taken to the emergency room, where she was diagnosed with a brain hemorrhage. Ta'Naejah died two days later. An autopsy determined that the cause of death was multiple blunt force injuries and that the manner of death was homicide.

Crump and Owens were arrested for Ta'Naejah's death.  After a jury trial, Crump was convicted of reckless homicide and child endangerment and Owens was convicted of murder, along with other charges.

After the criminal case, Kevin Lipman—who was appointed administrator of Ta'Naejah's estate—and Shabrina McCloud filed this lawsuit.  In their complaint, Plaintiffs named the following defendants: Armond Budish, in his official capacity as Cuyahoga County Executive; DCFS; Quint, Jackson, and Betts (the DCFS caseworkers); and Crump and Owens.**²** While Plaintiffs alleged state-law claims against all of these defendants, the case was filed in federal court because they claimed that the governmental defendants (meaning everyone except Crump and Owens) violated Ta'Naejah's substantive and procedural due process rights under the Fourteenth Amendment.

## B.  Defendants' Motion to Dismiss

After being served with Plaintiffs' complaint, the governmental defendants moved to dismiss.**³**  In their motion, Defendants say that Plaintiffs' substantive due process claim is barred by *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195 (1989), which held that the state generally has no obligation under the Due Process Clause to protect citizens from private harms.  And while there are exceptions to this rule when the state has custody of the victim or where the state takes an affirmative act that increases the victim's risk of harm—also known as the state-created danger doctrine—Defendants argued that neither of these exceptions applied to Ta'Naejah's case.  Defendants also said that Plaintiffs' procedural due process claim could not succeed because Plaintiffs could not point to a specific right of which Ta'Naejah was deprived by a state actor without adequate process, and because none of the statutes or regulations governing child-abuse investigations that Defendants allegedly violated guarantee any substantive outcome from those investigations.

---

**²**The complaint also listed several John and Jane Does who were social workers or other employees of either Cuyahoga County or DCFS, but Plaintiffs have not yet identified these individuals.

**³**Crump and Owens never responded to the complaint and are not parties to this appeal.  Accordingly, we use the term Defendants in this opinion to refer only to the governmental defendants in this case.

Moving beyond the merits of the claims themselves, Defendants also argued that Plaintiffs' claims against Budish—a stand-in for the county—fail because Plaintiffs had not shown that the alleged harm was caused by an official policy or custom, as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). And while *Monell*'s requirements do not extend to the individual caseworkers, Defendants claimed they were instead protected by qualified immunity. Defendants' qualified immunity argument was primarily based on their contention that there was no constitutional violation at all, and so overlaps with the merits of Plaintiffs' claim. But Defendants also added that Plaintiffs "fail[ed] to allege any clearly established federal right that a reasonable caseworker would have known she was violating regarding Ta'Naejah," because "under *DeShaney* and its progeny, no reasonable caseworker could have understood that allowing Ta'Naejah to remain in her mother's custody clearly violated anyone's constitutional rights. There was no law that clearly established that the caseworkers' conduct was unlawful." (Mot. to Dismiss, R. 9 at PageID #92.) Defendants did not address whether, assuming there was a constitutional violation, qualified immunity applied to the caseworkers' decision to interview Ta'Naejah in the presence of Crump and Owens, the central basis for Plaintiffs' state-created danger theory.

Finally, Defendants also argued that sovereign immunity protected them with respect to all of Plaintiffs' state-law claims. Accordingly, they asked for the district court to dismiss the complaint against them in its entirety.

## C. Discovery in the District Court

On the same day that Defendants moved to dismiss the complaint, they also moved to stay discovery pending a decision on that motion. But the court denied that request and ordered discovery to continue in accordance with an earlier case management order. As part of that discovery, the parties filed a stipulated protective order, to which the district court agreed. A portion of that order concerned deposition testimony:

> Deposition testimony shall be deemed CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER only if designated as such. Such designation shall be specific as to the portions of the transcript or any exhibit to be designated as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER. Thereafter, the deposition transcripts and any of those portions so designated shall be protected as

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, pending objection, under the terms of this Order.

(Stipulated Protective Order, R. 15 at PageID #167.)

Another portion of the order concerned filing documents that contained information or testimony designated as confidential:

Absent a statute or an order of this Court, documents may not be filed under seal. Neither this Stipulated Protective Order nor any other sealing order constitutes blanket authority to file entire documents under seal. Only confidential portions of relevant documents are subject to sealing.

To the extent that a brief, memorandum or pleading references any document marked as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER, then the brief, memorandum or pleading shall refer the Court to the particular exhibit filed under seal without disclosing the contents of any confidential information. If, however, the confidential information must be intertwined within the text of the document, a party may timely move the Court for leave to file both a redacted version for the public docket and an unredacted version for sealing.

(*Id.* at #169–70 (citations omitted).) The order also noted that "there is a presumption in favor of open and public judicial proceedings in the federal courts, [and so] this Order shall be strictly construed in favor of public disclosure and open proceedings wherever possible." (*Id.* at #165.) Finally, the order contained procedures by which a party could challenge the other side's confidentiality designations, in which case the court would resolve the issue.

Following the entry of this order, Plaintiffs took the depositions of the DCFS caseworkers who investigated Ta'Naejah's abuse. During these depositions, Plaintiffs say that the defendant-witnesses admitted they had taken affirmative acts by conducting the interviews of Ta'Naejah, and that interviewing a child in the presence of an alleged abuser increases the likelihood that the abuser will retaliate against the child and subject her to further harm, even where the child does not admit to being abused in the interview. Defendants never submitted designations listing specific portions of these transcripts that were confidential, but instead had the court reporter type "CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER" on the cover page of each. (Quint Dep. Cover Page, R. 23-1; Jackson Dep. Cover Page, R. 23-2.)

**D.  The District Court's Orders and Plaintiffs' Proposed Amended Complaint**

In May 2019, while the parties were still conducting discovery, the district court granted Defendants' motion to dismiss.  *Lipman v. Budish* (*Lipman I*), 383 F. Supp. 3d 764 (N.D. Ohio 2019).  First, the court found that DCFS was not itself a proper defendant, and that claims against it would instead have to proceed against the county.  *Id.* at 769–70.[4]  Second, turning to Budish, the court held that Plaintiffs failed to state an official-capacity claim under *Monell* because their allegations did not establish inadequate supervision of the case workers or a custom of tolerating constitutional violations.  *Id.* at 770–71.

Third, the district court held that Plaintiffs' substantive due process claim failed because neither of the exceptions to *DeShaney* applied:  Ta'Naejah was never in the county's custody, and their decision to interview Ta'Naejah in front of Crump and Owens could not amount to a constitutional violation.  *Id.* at 772–76.  On this last point, the court reasoned as follows:

> To the extent plaintiffs allege that defendants violated certain policies or state laws, the Court agrees with defendants that plaintiff[s] are improperly attempting to convert alleged violations of state law into a federal due process claim. Additionally, *DeShaney* recognized that while the state may impose affirmative duties upon its agents, a violation of those duties does not "constitutionalize" the duties.

*Id.* at 775.

Finally, the court held that Plaintiffs failed to state a procedural due process claim, agreeing with Defendants that because none of the state statutes they allegedly violated contain guarantees of substantive outcomes, the alleged violations of those statutes could not support a procedural due process claim.  *Id.* at 776–78.  And because all of Plaintiffs' federal claims had been dismissed on the merits, the court declined to exercise supplemental jurisdiction over their state-law claims, *id.* at 778–79, and so never addressed Defendants' motion with respect to those issues.[5]  Similarly, the court never reached Defendants' qualified immunity arguments.

---

[4]Plaintiffs have not challenged this ruling on appeal.

[5]On appeal, the parties also have not addressed these claims.  Because we reverse the dismissal of Plaintiffs' substantive due process claim, we additionally vacate the dismissal of Plaintiffs' state-law claims and

After the motion to dismiss was decided, Plaintiffs filed a motion for leave to file under seal. In that document, Plaintiffs said that they intended to file a motion to reconsider that cites deposition testimony and transcripts. Because, Plaintiffs said, the stipulated protective order "require[d] deposition testimony pertaining to this matter [to] be filed under seal," they asked for leave to file the motion to reconsider until seal as well. (Mot. for Leave, R. 21 at PageID #241.) In a text-only docket entry two days later, the court said: "Plaintiff's Motion for Leave to File Under Seal is DENIED. Deposition testimony may not be considered on a Motion to Dismiss." (Docket Order, June 12, 2019.)

A few days later, Plaintiffs filed a motion both to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) and to file a first amended complaint under Rule 15(a). In that motion, Plaintiffs discussed the caseworkers' deposition testimony and asked to file an amended complaint including additional allegations on state-created danger that were uncovered through those depositions.[6] Specifically, Plaintiffs said they took "the exact testimony from these Defendants and placed it into their amended complaint to meet the pleading standard for state created danger." (Rule 59 Mot., R. 22 at PageID #246; *see also id.* at #247 ("The above allegations are supported by the admissions contained in depositions. Witnesses have testified that caseworkers affirmatively acted to interview the child in front of her abusers at least four times; that it was foreseeable that an abuser would retaliate against the victim; and further admitted that interviewing a child in front of her abusers increased the danger to the child.").) In a footnote, Plaintiffs mentioned the sealing issue and why they did not attach the transcript pages themselves:

> Plaintiffs requested leave to file the deposition transcripts under seal pursuant to the protective order for the Court to consider new evidence; however the Court denied Plaintiffs' motion. Plaintiffs are well aware that deposition testimony cannot be used under a Rule 12(b)(6) motion. Deposition testimony was proposed to be used purely for the limited purpose of showing the Court [that]

---

remand for the district court to assess their merits in the first instance. *See Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 493–94 (6th Cir. 2015), *aff'd*, 137 S. Ct. 1002 (2017).

[6]Plaintiffs also say they tried to address other potential defects highlighted in the court's earlier dismissal order.

> Plaintiffs have new evidence for the Rule 59(e) Motion to Reconsider and ha[ve] made the amended allegations in good faith.

(*Id.* at #247 n.3 (citations omitted).)

In response, Defendants moved to strike Plaintiffs' motion and their proposed amended complaint. In that motion, Defendants argued that the cover sheets to the deposition transcripts designated them as confidential in their entirety, and so any information derived from those transcripts could not be disclosed. Defendants also pointed to Plaintiffs' earlier motion to seal as evidence that they agreed these transcripts had to be protected. Thus, Defendants say that Plaintiffs should have asked for leave to file both redacted and unredacted versions of their motion but failed to do so. "Instead, despite the Stipulated Protective Order and despite this Court's prior ruling denying Plaintiff's [sic] leave to file under seal, Plaintiffs simply filed their Motion that liberally uses information taken from the confidential transcripts." (Mot. to Strike, R. 23 at PageID #308.) And so, because "Plaintiffs willfully and intentionally violated the Stipulated Protective Order," Defendants asked the court to strike their filings from the docket. (*Id.* at #309–10.)

The court agreed with Defendants and struck Plaintiffs' filings, specifically noting that the cover pages to the transcripts designated them as confidential and that Plaintiffs had conceded as much by filing their original motion to seal. *Lipman v. Budish* (*Lipman II*), No. 1:18-CV-2985, 2019 WL 4194176, at *1–3 (N.D. Ohio Sept. 4, 2019). It also noted that Plaintiffs never followed the protective order's procedures for challenging a designation, and so could not later complain that those designations were invalid. *Id.* at *3.

The court went on to say that even if it had not decided to strike the motion, it would still have denied it in any event. *Id.* While Plaintiffs argued that they asked for leave to amend at the close of their opposition to the motion to dismiss, the court held that it was not required to grant leave to amend based merely on a superficial request for amendment at the end of an opposition brief. *Id.* The court also found that Plaintiffs failed to meet the requirements of Rule 59:

> Plaintiffs argue that they have "new evidence" in the form of the deposition testimony which now demonstrates a viable substantive due process claim based on both the state created danger and custody exceptions to the established rule as

well as a *Monell* claim.  But, plaintiffs acknowledge in their motion that they "received deposition transcripts days before this Court entered its ruling" on the Motion to Dismiss.  The Motion to Dismiss was fully briefed as of April 22, 2019, and plaintiffs do not dispute defendants' statement that the depositions were completed by May 1.  Although plaintiffs assert that the depositions were not transcribed until May 15 and, as a result, they did not have an opportunity to amend the Complaint prior to this Court's ruling on May 23, this Court held a status conference on May 16.  On that date, the Court let the parties know that the ruling on the Motion to Dismiss was forthcoming, and plaintiffs did not mention an intention to amend their Complaint.

Accordingly, plaintiffs have not demonstrated that they have new evidence.

*Id.* at *4 (citation omitted).

The district court also said it had not erred by dismissing Plaintiffs' state-created danger claim in its original order:

Here, plaintiffs are essentially alleging that the state actors' action of interviewing the child in front of her abusers created or increased their intent to abuse her which led to her death.  The Court agrees with defendants that plaintiffs are trying to do "an end-run" around the law which does not hold the government liable on a substantive due process claim when it fails to protect and investigate; returns a child to an abusive situation; or violates duties, policies, or state laws.

*Id.* at *5. Plaintiffs then appealed.

**E.  Proceedings on Appeal**

On appeal, Plaintiffs outlined the facts alleged in their original and proposed amended complaint, and went on to argue that the district court erred by dismissing their original complaint and by striking or alternatively denying their Rule 59 motion.  Specifically, Plaintiffs said that their substantive due process claim was supported by both the custody and state-created danger exceptions to *DeShaney*, that the state had violated Ta'Naejah's rights by discharging her from the hospital and into Crump's and Owens's custody without procedural due process, and that Plaintiffs had successfully stated a *Monell* claim against Budish based on a custom of tolerating constitutional violations.  With respect to their Rule 59 motion, Plaintiffs say the district court erred in striking it because Defendants' confidentiality designations for the depositions were themselves improper, as they merely labeled the transcripts "confidential" on the cover pages and did not designate the specific portions of the transcript that should be

protected. Further, the allegations in the complaint were simply facts about Defendants' knowledge, and should not have been sealed regardless of where Plaintiffs learned of them. Finally, Plaintiffs say that because district courts should not dismiss civil rights complaints without first granting leave to amend, the district court erred in denying their Rule 59 motion on the merits.

While Defendants opposed each of these points in their brief, they also raised two additional issues of their own. First, they argued that the bulk of Plaintiffs' appeal should be dismissed as untimely. While normally a Rule 59 motion extends the time to file a notice of appeal, Defendants say that the district court's decision to strike that motion rendered it a nullity, and so it no longer could extend that deadline. So, if this Court upholds the district court's decision to strike, Defendants say the rest of Plaintiffs' appeal—namely their challenge to the dismissal of the complaint—must be dismissed for lack of jurisdiction. Second, Defendants reiterated their argument that, even if this Court reaches the merits of Plaintiffs' appeal and even if it finds there was a constitutional violation, the caseworkers are entitled to qualified immunity. But again, Defendants exclusively framed this argument in terms of returning Ta'Naejah to Crump and Owens, and did not address Plaintiffs' state-created danger arguments based on the interviews.

Defendants also filed a motion to seal Plaintiffs' brief on appeal. In this motion, Defendants argue that Plaintiffs' brief contains information taken from the stricken proposed amended complaint, which in turn was taken from the deposition transcripts. Thus, the brief also violated the district court's protective order, and so Defendants say it should be filed under seal. That said, Defendants identify only four pages of Plaintiffs' brief that contain allegedly confidential information, and Defendants cite no case law and provide no reason why the brief should be sealed other than the district court's protective order.

## II.  TIMELINESS OF APPEAL

As a threshold matter, Defendants argue that we should not reach the merits of Plaintiffs' complaint and the district court's decision to dismiss it because their notice of appeal was untimely, at least with regard to that decision. Plaintiffs relied on their Rule 59 motion to extend

the time to appeal, which is expressly allowed under the Federal Rules of Appellate Procedure. Fed. R. App. P. 4(a)(4)(A)(iv).  But the district court struck this motion, which Defendants say rendered it a nullity.  And so, without that motion to extend the deadline to file, Plaintiffs needed to have filed their notice of appeal within thirty days of the court's original decision on the motion to dismiss, which they did not do because they instead sought reconsideration under Rule 59.

This argument is wrong on multiple levels.  First, the plain text of the rule shows that Plaintiffs' appeal was timely.  Under the Federal Rules of Appellate Procedure, a notice of appeal must be filed "within 30 days after entry of the judgment or order appealed from."  Fed. R. App. P. 4(a)(1)(A). But there is an exception for when various motions—including a motion to alter or amend the judgment—are timely filed under the Federal Rules of Civil Procedure. Fed. R. App. P. 4(a)(4)(A).  In such a case, "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." *Id.*

This rule does not use the words "grant" or "deny" or otherwise limit what dispositions are adequate to start the clock for filing an appeal.  Nor does it exclude later-stricken motions. Rather, the rule says that it is "the entry of the order disposing of the . . . motion" that triggers the deadline to appeal. *Id.*  An earlier case from this Court—rejecting a similar linguistic slight-of-hand about timeliness—noted that a motion is disposed of within the meaning of Rule 4 whenever the district court takes final action on it. *Lexon Ins. Co. v. Naser*, 781 F.3d 335, 337–39 (6th Cir. 2015); *see also id.* at 340 ("In the final analysis, the district court did not resolve and dispose of the issues raised in Naser's May 14 motion until June 4.  That gave Naser until July 7 to file his notice of appeal—30 days 'from the entry of the order disposing of' his motion plus the July 4 weekend." (quoting Fed. R. App. P. 4(a)(4)(A))).  And in this case, that final action was the district court's order striking and alternatively denying Plaintiffs' Rule 59 motion. Because the notice was filed within thirty days of that order, Plaintiffs' appeal in this case is timely.

Second, Defendants' reading of the rule would yield absurd results.  Under their view, because the successful motion to strike meant Plaintiffs' Rule 59 motion should be treated as though it never was filed, it cannot serve to extend the time to appeal.  But this would defeat the

whole purpose of Rule 4, and prudent lawyers would have no choice but to constantly file multiple notices of appeal—precisely what the rule works to avoid—just to ensure that the district court cannot later strike a post-judgment motion, rendering their appeal untimely with no way to remedy the defect.  In this way, Defendants' argument would allow a district court to strike a motion instead of merely denying it, and thereby insulate its earlier rulings on the merits from any appellate review.

Plaintiffs cite a Ninth Circuit case for the proposition that "[t]he effect of granting a motion to strike is to delete a filing from the record," meaning that "Plaintiffs' Rule 59(e) Motion should be treated as if it was never filed."  (Appellee Br. at 13 (citing *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)).)  But that case came out the other way, and rejected the defendants' position precisely because of the absurd outcome for which Defendants advocate here:

> A movant's right to appeal from an order denying a motion is worth little if the denying judge can strike the motion from the record altogether.  Approval of the district court's action would establish a procedure that, if abused, could shield erroneous district court orders from review.  We hold that [Rule] 12(f) should not be construed as allowing this undesirable result.

*Sidney-Vinstein*, 697 F.2d at 885; *see also Lexon*, 781 F.3d at 339 ("Courts have even emphasized that papers 'stricken by the district judge' for noncompliance with local rules 'should remain filed' for purposes of Civil Rule 5(d)(4) and the Appellate Rules if the right to appeal would be lost otherwise." (quoting *NationsBank, N.A. v. Plecas*, 84 F.3d 1453 (table) (D.C. Cir. 1996) (per curiam))).  The same logic applies with equal force here.

While the district court struck Plaintiffs' Rule 59 motion for failure to comply with the stipulated protective order, the order striking that motion counts as its final disposition with respect to the rules governing the timeliness of an appeal.  Furthermore, the decision to strike a post-judgment motion for failure to comply with a court order or local rule cannot negate an otherwise-timely appeal of an earlier decision on the merits when the notice of appeal is filed pursuant to Federal Rule of Appellate Procedure 4(a)(4)(A).  Accordingly, Plaintiffs' notice of appeal in this case was timely filed, and we can consider the entirety of their appeal on the merits.

## III. MOTION TO DISMISS

### A. Standard of Review

We review a district court's grant of a motion to dismiss de novo. *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 864 F.3d 455, 458 (6th Cir. 2017). Under that standard, a motion to dismiss is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6).

To survive a motion to dismiss, the plaintiff must allege facts that are sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The reviewing court must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005). This Court may affirm the district court's dismissal of the plaintiff's claims on any grounds present in the record, including grounds not relied upon by the district court. *Long v. Insight Commc'ns of Cent. Ohio, LLC*, 804 F.3d 791, 794 (6th Cir. 2015); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 547–48 (6th Cir. 1999). Finally, the determination to dismiss with prejudice, as opposed to without, is reviewed under an abuse of discretion standard. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990).

### B. Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In most cases, this means that the government must provide adequate procedural safeguards before it can restrict one of these rights. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). But some rights—referred to by the courts as fundamental rights—are so important that no amount of

procedure alone will do. Rather, the state can only infringe upon these rights if its imposition "is narrowly tailored to serve a compelling state interest," a doctrine referred to as substantive due process. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). The right to life and safety through personal security is such a fundamental interest, and therefore is protected by the substantive portion of the Due Process Clause. *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982).

That said, the Constitution concerns the actions of government, not private citizens. And so, while the government cannot infringe upon a fundamental right without a compelling state interest, the state generally is not obligated to protect those rights against harm from private actors. That is the central holding of *DeShaney*. 489 U.S. at 197.

The facts of *DeShaney*—similar in many ways to this case—"are undeniably tragic." *Id.* at 191. The plaintiff, Joshua DeShaney, was a child in the custody of his father when the police learned that his father may have been abusing him. *Id.* at 191–92. The county department of social services interviewed the father, who denied the accusations, and the county did not pursue the matter any further. *Id.* at 192. About one year later, Joshua was admitted to the hospital with multiple bruises and abrasions. *Id.* The county initially obtained a court order placing Joshua in the custody of the hospital, but later decided there was insufficient evidence of abuse, and so released Joshua to his father. *Id.* The county did, however, enter into a voluntary agreement with the father that included several measures to help protect Joshua's safety. *Id.*

This agreement did little to help. Over the next few months, Joshua returned to the emergency room with suspicious injuries, and during multiple home visits, the county caseworker noticed further injuries and other evidence of abuse. *Id.* at 192–93. But the county did nothing to intervene or remove Joshua from his father's home. *Id.* Ultimately, Joshua's father beat him so severely that he fell into a coma, and while doctors were able to save his life, his injuries caused such a high degree of brain damage that Joshua was expected to be institutionalized for the rest of his life. *Id.* at 193.

Through his mother, Joshua sued the county and various employees, alleging that they failed to intervene despite knowing that he was being abused. *Id.* But the Supreme Court held

that, "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. In an attempt to get around this general rule, Joshua argued that the state had a "special relationship" with him that arose because it knew of his risk of abuse and had expressed its intention to protect him from that danger. *Id.* The Court rejected this argument, holding that this relationship alone was not enough to create a constitutional duty to act. *Id.* at 198–202.

The Court noted—or at least alluded to—two exceptions, though, saying that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. First, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. This is the custody exception to the general rule in *DeShaney*. Second, the Court noted that, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. The circuit courts, including our circuit, have interpreted this statement as providing another exception to *DeShaney* where the state acts to create or increase the danger of private harm: the state-created danger doctrine. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066–67 (6th Cir. 1998); *see also Butera v. District of Columbia*, 235 F.3d 637, 648–49, 649 n.10 (D.C. Cir. 2001) (collecting cases).

In this case, Plaintiffs say that their claims fit within both of *DeShaney*'s exceptions, and so the county and its employees should be held responsible for the events leading to Ta'Naejah's death. First, they argue that the county had custody over Ta'Naejah, both during her hospitalization and in the month immediately before she died. Second, even if the county did not have custody over Ta'Naejah, the caseworkers' decision to repeatedly interview her in the presence of Crump and Owens significantly increased her risk of abuse, and so their claims can proceed under the state-created danger doctrine.

Plaintiffs arguments about the custody exception fail. Even assuming that Ta'Naejah was ever in state custody during the period at issue in the complaint, her injuries all occurred outside of that custody when she was returned to Crump and Owens, and under *DeShaney* itself, the act

of returning a child to her earlier situation of parental custody cannot give rise to constitutional liability. But Plaintiffs' state-created danger argument is better supported by our case law. Drawing all reasonable inferences in their favor, the decision to repeatedly interview Ta'Naejah in front of her abusers was an affirmative act that increased her risk of private violence, and so can support a claim under the Due Process Clause. Because multiple caseworkers all interviewed Ta'Naejah in the presence of her abusers, and because the right to avoid state-created danger is clearly established in this circuit, Plaintiffs have successfully pleaded a *Monell* claim against the county based on a custom of constitutional violations, and the individual caseworkers are not entitled to qualified immunity at the current stage of this case.

### 1. Custody Exception

In their opposition to Defendants' motion to dismiss, and again on appeal, Plaintiffs try to escape *DeShaney* by saying that Ta'Naejah was in the county's custody at the time of her injuries. Plaintiffs argue that two different instances of custody support liability under that exception. First, they say that during Ta'Naejah's October 2016 hospitalization, Defendants had custody over Ta'Naejah because they had the sole power to decide whether she could be discharged from the hospital and returned to Crump and Owens. Second, Plaintiffs say that the state had the authority to take Ta'Naejah from her home and bring her to medical appointments in February and March 2017.

Neither of these can support liability under *DeShaney*. This is because Ta'Naejah did not suffer her injuries when confined to the hospital or when caseworkers took her to see a doctor, but rather after they returned Ta'Naejah to her home. This is seen through Plaintiffs' repeated arguments that the state violated Ta'Naejah's rights by returning her to Crump's and Owens's control, thereby causing her abuse and death. *See Bukowski v. City of Akron*, 326 F.3d 702, 709 n.1 (6th Cir. 2003) ("The Bukowskis argue that their claim should be treated under the custodial exception to *DeShaney*. It is clear, however, that there was no custody here. . . . In fact, this is precisely what the Bukowskis are complaining about. Their argument is essentially that the police officials should have taken custody of Lisa Bukowski but did not.").

By its own terms, this exception to *DeShaney* only applies to injuries that occur when the plaintiff is in the state's custody.  *See* 489 U.S. at 201 ("Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor.").  And while the state can be held responsible when it discharges someone from custody in a manner that increases her risk compared to the status quo, *see, e.g.*, *Stemler v. City of Florence*, 126 F.3d 856, 867–69 (6th Cir. 1997), the custody exception does not provide a path to liability when the plaintiff is released into the same situation and risks she faced before the state intervened.  *DeShaney* itself held as much. *See* 489 U.S. at 201 ("That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter."); *see also Engler v. Arnold*, 862 F.3d 571, 576 (6th Cir. 2017) ("[U]nder *DeShaney*, even returning a child to an abusive home, without more, is insufficient to create a constitutional duty to protect."); *Bukowski*, 326 F.3d at 709 (same).

Even if Ta'Naejah was somehow in the legal co-custody of the state during the month in which it could take her to medical appointments (a proposition that Defendants strongly oppose), the facts alleged in Plaintiffs' complaint do not show the degree of custody required to invoke the exception to *DeShaney*.  As *DeShaney* itself put it:

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety— it transgresses the substantive limits on state action set by . . . the Due Process Clause.

489 U.S. at 200.  This Court has also emphasized the extent of control required to meet this exception under *DeShaney*, defining "custody" as the "intentional application of physical force and show of authority made with the intent of acquiring physical control."  *Cartwright v. City of Marine City*, 336 F.3d 487, 491–92 (6th Cir. 2003) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002)).

The ability to bring Ta'Naejah to her doctor's appointments did not "so restrain[]" her liberty as to "render[] [her] unable to care for [her]self," *DeShaney*, 489 U.S. at 200, at least outside the brief periods in which the caseworkers were physically taking her to the appointments. Whatever merit there is to Plaintiffs' claim that DCFS maintained co-custody over Ta'Naejah during this period, the degree of control alleged in the complaint does not give rise to a constitutional duty to protect.

## 2. State-Created Danger Exception

Moving beyond the custody exception, Plaintiffs say that the county and its caseworkers took affirmative acts that increased Ta'Naejah's risk of harm. Specifically, they allege that caseworkers repeatedly interviewed Ta'Naejah about her abuse in the presence of Crump and Owens, acts that violated written DCFS policy and that Plaintiffs say the caseworkers knew would place Ta'Naejah at an increased risk of further abuse. Based on these facts, Plaintiffs argue that Defendants are liable for Ta'Naejah's death under the state-created danger doctrine.

While not expressly spelled out by *DeShaney*, this Court has recognized an exception to the principle that the state cannot be liable for private acts of violence, even outside of a custodial setting. *Engler*, 862 F.3d at 575; *Cartwright*, 336 F.3d at 493. That exception—the state-created danger doctrine—applies when the state affirmatively acts in a way that either creates or increases a "risk that an individual will be exposed to private acts of violence." *Engler*, 862 F.3d at 575 (quoting *Kallstrom*, 136 F.3d at 1066).

There are three elements that a plaintiff must prove to establish a claim under this doctrine:

> To show a state-created danger, plaintiff must show: 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright*, 336 F.3d at 493 (citing *Kallstrom*, 136 F.3d at 1066).

In their motion to dismiss (and also on appeal), Defendants do not contest the special-danger or knowledge requirements,[7] but instead say that Plaintiffs have failed to show an affirmative act that can give rise to constitutional liability. Specifically, while Plaintiffs focus on the caseworkers' decision to interview Ta'Naejah in front of Crump and Owens, Defendants say that imposing liability for that choice would "transform violation of [their state-law] duties into a violation of the Due Process Clause," which in any event cannot qualify as an affirmative act because the interviews only provided a motive for Crump and Owens to further abuse Ta'Naejah, and not the means to do so. (Appellee Br. at 20–23.)

"Whether conduct amounts to an 'affirmative act' in this context is at times a difficult question." *Engler*, 862 F.3d at 575. At one end of this spectrum, a failure to act is not enough. *Id.* at 575–76. Instead, to find a state-created danger, the plaintiff must have been "safer *before* the state action than he was *after* it." *Cartwright*, 336 F.3d at 493; *accord, e.g.*, *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 855 (6th Cir. 2016); *see also Koulta v. Merciez*, 477 F.3d 442, 445–46 (6th Cir. 2007) ("Rather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'" (alteration in original) (quoting *Cartwright*, 336 F.3d at 493)). For this reason, this Court has often rejected a plaintiff's due process claim "because the challenged conduct either was not an affirmative act at all or did not create or increase the risk of private violence to the plaintiff." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 465 (6th Cir. 2006) (collecting cases).

Two cases help illustrate the other end of this spectrum and show how liability can attach when the state's affirmative acts increase the plaintiff's risk of harm. In *Kallstrom v. City of Columbus*, the plaintiffs were undercover police officers assigned to a drug investigation. 136 F.3d at 1059. During the resulting criminal trial, defense counsel requested a copy of their personnel records from the police department; the records contained extensive and intimate

---

[7]This knowledge prong is synonymous with the requirement that the state official's conduct must "fairly be said to shock the contemporary conscience." *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933 (6th Cir. 2020) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). As discussed further below in the qualified immunity context, *see infra* Part III.B.4, conduct typically meets this conscience-shocking standard when the executive actor is "deliberately indifferent to the risk of a private party's harm." *Jackson Local Sch. Dist.*, 954 F.3d at 933.

personal information about the officers. *Id.* The department turned over the records, believing it was obligated to do so under Ohio public records law, despite its promises to the officers that the information would be kept in confidence. *Id.* The information eventually found its way into the hands of gang members, and so the officers sued the city, alleging that the information's release violated their substantive due process rights. *Id.* at 1059–60.

On appeal, this Court agreed, finding that the disclosure of the information in question posed a threat to the officers' safety. *Id.* at 1062–64. Thus, the state's decision to release that information "implicate[d] a fundamental liberty interest, specifically [the officers'] interest in preserving their lives and the lives of . . . their family members, as well as preserving their personal security and bodily integrity." *Id.* at 1062.

Of course, this threat to the officers' lives and safety did not come from the city itself; it came from the gang members who obtained the information. *Id.* at 1066. And so, looking to the state-created danger exception alluded to in *DeShaney*, this Court found that the release of the information was an affirmative act that "placed the officers and their family members in 'special danger' by substantially increasing the likelihood that a private actor would deprive them of their liberty interest in personal security." *Id.* at 1066–67. Accordingly, despite *DeShaney*'s restrictions, the officers could state a claim based on substantive due process. *Id.*

*Nelson v. City of Madison Heights*, 845 F.3d 695 (6th Cir. 2017), features similar though far more tragic facts. A nineteen-year-old named Shelly Hilliard was confronted at a hotel by a police officer who saw a bag of marijuana through an open window to her room. *Id.* at 697–98. "To avoid arrest, Hilliard asked whether she could 'work off' the possession charge" by assisting the officers in a takedown of her dealer. *Id.* at 698. And so, Hilliard called the dealer to ask for a delivery of drugs to the hotel, and officers made a traffic stop before he could arrive. *Id.*

At the traffic stop, officers separated the drug dealer and Marquita Clark, a woman who was riding in his car as a passenger. *Id.* At some point, one of the officers spoke to Clark and told her that he was the one who had called to order the drugs, demanding that Clark tell him where the pair got their drugs from as well. *Id.* When asked at his deposition why he said this to Clark, the officer responded, "I don't know," but the obvious effect was to out Hilliard as an

informant. *Id.*[8]   Just days later, after he was released from jail, the drug dealer and an accomplice kidnapped and murdered Hilliard in revenge. *Id.* at 699.

Hilliard's mother filed suit, claiming that the officer's statement to Clark amounted to a state-created danger and violated her daughter's substantive due process rights. *Id.* at 699–700. As a defense, the officer claimed qualified immunity and argued that "his actions did not create or increase the risk of violence that Hilliard faced because she voluntarily became a confidential informant." *Id.* at 700.

This Court rejected those arguments, upheld the plaintiff's claim, and denied the officer qualified immunity. *Id.* at 703.   On the question of whether the disclosure counted as an affirmative act under *DeShaney*, the Court held that it did, because the officer's "act of disclosing Hilliard's name to the drug dealer's companion 'substantially increas[ed] the likelihood that a private actor would deprive' her of her liberty interest in personal security." *Id.* at 701 (quoting *Kallstrom*, 136 F.3d at 1067).   Thus, even though Hilliard voluntarily became an informant, the officer's disclosure of that information to Clark increased her risk of harm over what she faced before the officer's action. *Id.* at 700–02.

Back to the facts alleged here.   On a motion to dismiss, we must draw all reasonable inferences in favor of Plaintiffs when assessing whether the facts in their complaint demonstrate a state-created danger. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019).   That interviewing Ta'Naejah in front of her alleged abusers and asking about the source of her injuries increased her risk of further abuse is just such a reasonable inference.   Not only is this plausible (or at least not implausible) from a common-sense perspective, *see, e.g.*, *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense."), but this belief is reflected in the state's and county's written policies prohibiting such interviews wherever possible, *see, e.g.*, Ohio Admin. Code 5101:2-36-03(M) ("[DCFS] shall conduct and document face-to-face interviews with each child residing within the home of the alleged child victim.   If possible each child should be interviewed separately and apart from the alleged perpetrator.").

---

[8]In fact, Clark testified that the officer directly told her that Hilliard had set them up. *Nelson*, 845 F.3d at 698–99.

Defendants do not argue that the risk to Ta'Naejah was not increased by their actions. Instead, they say that the requirement to privately interview Ta'Naejah cannot give rise to a constitutional duty, and even if it could, the state-created danger exception does not extend to cases where the state only created a motive for private violence, as opposed to a heightened means for violence. For the reasons that follow, both of these arguments fail.

First, the fact that a duty exists under state law or regulations does not mean it cannot simultaneously exist under the Constitution. At a fundamental level, the right at issue here is the right articulated in *Youngberg* and before: the right to personal security, perhaps the pinnacle of an individual's interests in life and liberty. *See Youngberg*, 457 U.S. at 315 ("In the past, this Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977))). Such a right is separate and apart from any state regulation or policy, and the adoption of such a policy—reflecting the importance of these interests—cannot serve to demote them from constitutional status. *Cf. Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019) (noting that under the Supremacy Clause, state law cannot impact substantive rights guaranteed by the federal Constitution).

Second, Defendants' means-versus-motives distinction finds no support in the law and warps this Court's cases to fit their newly invented paradigm. Defendants attempt to describe *Kallstrom* and *Nelson* as examples of where the state provided the means, rather than the motive, for private violence. This reading of those cases is implausible at best. In both *Kallstrom* and *Nelson*, the private actors had no desire to harm the plaintiffs before the state outed them as undercover officers or informants. While Defendants attempt to criticize Plaintiffs' claim as saying that Defendants' actions "*incited* Crump/Owens to kill Ta'Naejah" (Appellee Br. at 22), this description precisely tracks the facts of *Kallstrom* and *Nelson*.[9]

---

[9]*Nelson* itself discounts the importance of means in any means-versus-motives analysis. In that case, Hilliard was lured to the scene of her kidnapping and murder through her job as a sex worker. 845 F.3d at 699 & n.2. The defendant officer tried to argue that because of this, "it was Hilliard's decision to continue to engage in prostitution that led to her demise," rather than the officer's revealing that Hilliard was an informant, which incited her drug dealer to kill her. *Id.* at 701. The Court rejected that argument, noting that "a reasonable jury could find that Hilliard's prostitution was merely the means by which her murderers chose to lure her, not an act that led to her

At bottom, the type of state-created danger alleged by Plaintiffs is highly analogous to the danger in *Kallstrom* and *Nelson*: the state took some action that increased the chances that a private actor would cause the plaintiff harm. This is enough to show an affirmative act under the doctrine. To be sure, Defendants may ultimately prevail on this issue at summary judgment or at trial, such as by showing that there was no feasible alternative to interviewing Ta'Naejah in Crump's and Owens's presence, or by showing that her risk was not increased when compared to not interviewing Ta'Naejah at all. But taking the allegations in the complaint as true, and drawing all reasonable inferences in Plaintiffs' favor, compels the conclusion that Plaintiffs have adequately alleged a claim based on state-created danger, and the district court erred in finding otherwise.

### 3. Municipal Liability

On appeal, Plaintiffs reiterate their argument that Budish, as county executive, should be liable for the constitutional violations they alleged in their complaint. Under 42 U.S.C. § 1983, while a municipality can be held liable for a constitutional violation, there is no vicarious liability based on the acts of its employees alone. *Monell*, 436 U.S. at 690–91. Rather, a local government can be sued under § 1983 only when a policy or custom of that government caused the injury in question. *Id.* at 694; *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). The same applies to Budish, because a suit against him in his official capacity is the same as a suit against the county. *Monell*, 436 U.S. at 690 n.55.

Under *Monell* and its progeny, there are four ways a plaintiff can demonstrate a policy or custom that could allow for municipal liability:

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

---

death," whereas the officer's disclosure of her name "'substantially increas[ed] the likelihood that a private actor would deprive' her of her liberty interest in personal security." *Id.* (quoting *Kallstrom*, 136 F.3d at 1067).

*Burgess*, 735 F.3d at 478. Plaintiffs argue that the fourth of these applies, because the repeated interviews of Ta'Naejah in front of Crump and Owens demonstrate that the county had a policy or custom of interviewing abuse victims in the presence of their abusers.[10]

While the formal policy of DCFS and state regulations required caseworkers to avoid interviewing children in the presence of their alleged abusers, Plaintiffs argue that the facts suggest the county had an informal custom of ignoring this policy and conducting these interviews directly in front of suspected abusers. The Supreme Court has briefly explained this distinction between formal policies and informal customs:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997) (citation omitted). Thus, while policies are created through the official acts of the municipality's ultimate decision-makers, a custom can be informal but must be so extensive as to still be attributable to the municipality as a whole. *Ford v. County of Grand Traverse*, 535 F.3d 483, 495–96 (6th Cir. 2008). In the latter case, "[a] municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004); *see also Doe v. Claiborne County ex rel. Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996) (defining customs under *Monell* as "[d]eeply embedded traditional ways of carrying out state policy" (alteration in original) (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940))).

---

[10] While Plaintiffs also argued in their opposition to the motion to dismiss that the DCFS caseworkers were inadequately supervised, they have abandoned this argument on appeal, *see, e.g.*, *Burgess*, 735 F.3d at 477 n.2 (noting that claims raised in the district court but not briefed on appeal are abandoned); *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004) (same).

Based on the facts alleged in the complaint, a juror could reasonably infer that DCFS and the county had a custom of allowing caseworkers to interview potential abuse victims in the presence of their alleged abusers. The original complaint alleges six different instances, involving multiple different caseworkers, in which Ta'Naejah was interviewed about her abuse in front of Crump and Owens. At the motion-to-dismiss stage, without the benefit of discovery, these facts are enough to draw the reasonable inference that this custom was widespread throughout DCFS and known to policymakers within the county. *See, e.g.*, *Gregory v. City of Louisville*, 444 F.3d 725, 757 (6th Cir. 2006) (finding a custom under *Monell* at the summary judgment stage based on repeated violations and other evidence of an established practice).[11] Accordingly, the district court erred in dismissing Plaintiffs' claim against Budish.

### 4. Qualified Immunity

In a one-page span of their motion to dismiss and again at the end of their brief on appeal, Defendants argue that the caseworkers are protected by qualified immunity. That doctrine creates two requirements that must be met before a court can impose individual liability under 42 U.S.C. § 1983. First, depending on the stage of the litigation, the plaintiff must either allege or establish facts that "make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, the court must determine that the right in question was "clearly established" at the time of the defendant's actions. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *accord Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

---

[11]While the dissent points to our unpublished decision in *Payne v. Sevier County*, 681 F. App'x 443, 447 (6th Cir. 2017), for the proposition that "five instances of alleged misconduct, over three months, all involving the plaintiff himself is not enough to prove a custom," that case was before this Court following discovery and after a motion for summary judgment, not on a motion to dismiss. This differing procedural posture makes all the difference. While a plaintiff might not survive summary judgment where her only evidence of a custom of wrongdoing is the facts of her own case—particularly in the face of evidence suggesting that the misconduct was due to the individual officer's "personal circumstances [rather than] a widespread custom," *id.*—the same cannot be said at the motion-to-dismiss stage, where it is all but impossible for the plaintiff to have secured evidence of misconduct with respect to other individuals. Furthermore, the custom-or-practice issue in *Payne* revolved around the actions of a single corrections officer, whereas Plaintiffs' complaint in this case alleges a pattern of behavior by multiple caseworkers. On these facts, a reasonable factfinder could infer that DCFS's policy violations extend beyond just Ta'Naejah's case, and so Plaintiffs should be allowed to gather evidence through discovery that might prove out this claim.

Defendants lead by arguing that because there is no constitutional violation, they are entitled to qualified immunity. With respect to Plaintiffs' state-created danger claim, this argument fails for the reasons discussed above. Defendants also argue that Plaintiffs "fail to allege any clearly established federal right," because "under *DeShaney* and its progeny, no reasonable caseworker could have understood . . . that returning [Ta'Naejah] to her mother would have amounted to a state-created danger or somehow amounted to 'joint custody' or 'co-custody.'" (Appellee Br. at 29.) But nowhere, either in the district court or on appeal, do Defendants address qualified immunity with respect to Ta'Naejah's interviews or whether the right against such a state-created danger was clearly established law. *See, e.g.*, *United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (noting that "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," are forfeited (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))); *see also, e.g.*, *Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019) (finding forfeiture of a qualified immunity defense).

Even had Defendants adequately argued the qualified immunity point, the right that they infringed upon was clearly established at the time of their actions in this case. In *Kallstrom*, this Court recognized a right against government acts that threaten an individual's "security and bodily integrity," and held that state actors can be held liable under § 1983 for "increasing the likelihood that a private actor would deprive [the plaintiffs] of their liberty interest in personal security." 136 F.3d at 1062–64, 1067; *see also id.* at 1062–63 ("Individuals have 'a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity' . . . ." (quoting *Claiborne County*, 103 F.3d at 507)); *id.* at 1066 ("Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence."). Numerous other cases have reiterated this doctrine. *See, e.g.*, *McQueen*, 433 F.3d at 463–64; *Cartwright*, 336 F.3d at 493; *cf., e.g.*, *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) ("It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution."). And in *Nelson*, this Court directly addressed qualified immunity with respect to state-created danger, rejecting the officer's claim to qualified immunity because *Kallstrom* clearly established that the state may not affirmatively act in a way that creates or increases a risk of private violence, provided that the state actor had the requisite

mental culpability.  845 F.3d at 700–03; *see also id.* at 703  ("[T]he district court properly denied Officer Wolowiec's summary judgment motion because a reasonable jury could find that, under the state created danger theory of liability, he engaged in affirmative acts that increased Hilliard's risk of exposure to private acts of violence, which deprived Hilliard of her clearly established Due Process right to personal security and bodily integrity.").**12**

Perhaps for this reason, cases finding qualified immunity in the *DeShaney* context have relied on the fact that the plaintiff failed to show that state actors actually "created the danger—either by increasing the risk of harm to third parties by its affirmative conduct or by doing something that endangers a discrete member or group of the public." *Koulta*, 477 F.3d at 448. But the right to be free from such state-created danger was clearly established at the time of Defendants' actions. Accordingly, their assertion of qualified immunity must fail.**13**

## C.  Procedural Due Process

In addition to Plaintiffs' substantive due process claim, they also assert a procedural due process claim.  Within this claim, Plaintiffs say that when DCFS returned Ta'Naejah to Crump's

---

**12**Although *Nelson* was handed down after the October 2016 hospital interview, it was decided before the five other interviews alleged between February and March 2017.  And in any event, *Kallstrom* and numerous other decisions discussing it predated all of these interviews.

**13**While not addressed by Defendants in their limited discussion of qualified immunity, it is worth noting that describing the right at issue as the right against a state-created danger of bodily harm does not broadly expose officers to suit any time they take an affirmative act.  This is because, while an affirmative act that increases the plaintiff's risk of harm can give rise to a due process claim, this is only true when the defendant commits this act with the necessary mental state, usually meaning deliberate indifference as to whether her actions will harm the plaintiff.  *See, e.g.*, *Jackson Local Sch. Dist.*, 954 F.3d at 933 ("Our court has imported this deliberate-indifference standard into the state-created-danger context, at least when officials have 'the opportunity for reflection and unhurried judgments.'" (quoting *Bukowski*, 326 F.3d at 710)); *McQueen*, 433 F.3d at 469 (same); *see also, e.g.*, *Nelson*, 845 F.3d at 702 ("The state must have known or clearly should have known that its actions specifically endangered an individual." (emphasis omitted) (quoting *Kallstrom*, 136 F.3d at 1066)); *Cartwright*, 336 F.3d at 493 (same).  Thus, while the right at issue within the qualified immunity inquiry should be defined with an appropriate level of specificity, because the right at issue here is the right against a state official acting to increase an individual's risk of private violence with the knowledge of or at least deliberate indifference to that increased risk, the right is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

In their motion to dismiss, Defendants have not argued that the complaint fails to allege deliberate indifference.  But setting aside Plaintiffs' claims about the caseworkers' deposition testimony on this point (the transcripts of which are not before this Court), Defendants could still prevail at summary judgment or trial by showing that they lacked the requisite culpability and acted in good faith when they decided to interview Ta'Naejah in front of Crump and Owens.

and Owens's custody, it did so with the knowledge that the two would subject Ta'Naejah to severe physical abuse. And so, Plaintiffs argue, the state was also required to provide her with some procedural safeguard before taking that action.

To establish a procedural due process claim, a plaintiff must show that she was deprived of a protected liberty or property interest, and that this deprivation occurred without adequate procedural safeguards. *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 729 (6th Cir. 2011). In their motion to dismiss, Defendants exclusively focused on this first point, arguing that their decision to return Ta'Naejah to Crump and Owens could not itself implicate a protected liberty or property interest.

In the district court, Plaintiffs argued that a variety of state statutes created a protected interest, of which Defendants deprived Ta'Naejah when they discharged her from the hospital and failed to adequately investigate reports of abuse. But Plaintiffs have abandoned this argument on appeal.[14] Instead, Plaintiffs say that regardless of the protections granted by statute, the county's decision to return Ta'Naejah to Crump and Owens effectively sentenced her to abuse, and so some minimal due process was required before such a sentence could be imposed. In this, they claim that returning Ta'Naejah to her mother amounted to an affirmative deprivation of the life and liberty interests guaranteed by the Due Process Clause.

Importantly, Plaintiffs have not alleged that Ta'Naejah herself complained that she was being abused by Crump and Owens. Neither Ta'Naejah nor any guardian acting on her behalf ever sought out some sort of benefit or protection from the state that was denied without adequate process. And so regardless of whether a protected interest was implicated, Plaintiffs cannot prevail on such a procedural due process claim. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 760 (1982) ("[T]he State cannot presume that a child and his parents are adversaries. . . .

---

[14]This Court has held that similar statutes concerning child abuse investigations do not create a protected interest under the Fourteenth Amendment sufficient to trigger procedural due process requirements. *Langdon v. Skelding*, 524 F. App'x 172, 177–78 (6th Cir. 2013); *Tony L. ex rel. Simpson v. Childers*, 71 F.3d 1182, 1185–86 (6th Cir. 1995); *see also Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972))).

[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."); *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 700 (6th Cir. 2013) (same).

Furthermore, under *DeShaney*, individuals do not have a right to state protection against private harm. 489 U.S. at 197. And because there is no such right, the Due Process Clause cannot impose procedural requirements in connection with its deprivation. *See Pittman*, 640 F.3d at 729; *see also Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976) (holding that the degree of process required depends in part on the protected interest at stake). While Plaintiffs try to frame the decision to return Ta'Naejah to Crump and Owens as imposing a sentence of abuse, *DeShaney* and the cases that followed it make clear that this decision does not qualify as state action, and therefore does not amount to a deprivation that first requires notice and the opportunity to be heard. *DeShaney*, 489 U.S. at 201; *Bukowski*, 326 F.3d at 709; *cf. Mathews*, 424 U.S. at 348 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" (alteration in original) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring))).

Plaintiffs' argument also raises another version of the "unavoidable liability" problem discussed in *Cartwright* and *Bukowski*, under which both action and inaction can produce competing liability. *See Cartwright*, 336 F.3d at 494 ("The facts of this case presented a similar Catch-22 for [the officers]. If they had decided to take Cartwright into protective custody . . . , they, too, may have faced another lawsuit based on charges of false imprisonment . . . ."); *Bukowski*, 326 F.3d at 712 ("By failing to detain Bukowski, they face this lawsuit. If they had chosen to detain her, they may have faced another lawsuit based on charges of false imprisonment."). If the state acted to restrain Ta'Naejah and required some further process before returning her to her mother, that too could have opened the door to liability. *See, e.g.*, *Schulkers v. Kammer*, 955 F.3d 520, 539–40, 542–43 (6th Cir. 2020) (discussing the right to family integrity); *Kovacic*, 724 F.3d at 699–700 (same); *see also Santosky*, 455 U.S. at 769–70 (requiring at least "clear and convincing evidence" before the state can act to terminate parental rights). And what form would that process take? If Plaintiffs are correct that the decision to

interview Ta'Naejah in front of Crump and Owens increased her risk of abuse, what might some forced adversary proceeding have done to that risk, and would that be another basis for substantive due process liability?

Whatever process the Constitution requires before a state takes some affirmative action, it cannot require that same process even where the state declines to take action. For better or for worse, the Constitution generally imagines a default condition of liberty against which state intervention is restricted, and that default condition includes parental custody of their minor children. *See, e.g.*, *Santosky*, 455 U.S. at 753 (collecting cases); *Stanley v. Illinois*, 405 U.S. 645, 651–52 (1972) (same). Plaintiffs' procedureal due process claim is foreclosed by this choice of default, and so the district court was correct to dismiss it.

### D. Plaintiffs' Rule 59 Motion

Beyond their arguments concerning the dismissal of their original complaint, Plaintiffs also appeal the district court's order striking and denying their post-judgment Rule 59 motion. Because we are reversing the district court's judgment dismissing Plaintiffs' substantive due process claim, their motion to alter or amend that judgment is moot. Accordingly, we vacate the district court's order on Plaintiffs' Rule 59 motion without addressing its merits.

While we entrust any future motion to amend to the district court's discretion, there are two points worth noting. First, based on our review of the district court's docket, it seems that the order to strike Plaintiffs' Rule 59 filings served to prevent public access to those documents, in effect sealing them and restricting access to the parties alone. "Only the most compelling reasons can justify non-disclosure of judicial records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *In re Knoxville News-Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983)). As discussed below, *see infra* Part IV, that high bar was not met in this case, and so we direct the district court to unseal Plaintiffs' Rule 59 filings. On remand, the district court should require the parties to meet this standard before allowing a filing under seal or otherwise limiting the public's ability to access judicial records.

Second, while there is no need for us to address the merits of Plaintiffs' Rule 59 motion at this time, on remand, Plaintiffs will be able to move to amend their complaint without a final

judgment standing in their way.  In such a case, the more permissive standards of Federal Rule of Civil Procedure 15 would govern the motion, as opposed to the heightened requirements under Rule 59 for post-judgment motions to amend.  *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

## IV.  MOTION TO SEAL

Finally, we turn to Defendants' motion to seal Plaintiffs' brief on appeal, which Defendants say is appropriate because Plaintiffs' appellate brief references the same deposition testimony at issue in their Rule 59 motion.  Specifically, Defendants claim that "Plaintiffs['] Brief has confidential information contained therein that [is] covered by a Protective Order.  In particular, references to allegations in an amended complaint that were struck from the record by the District Court."  (Mot. to Seal (citation omitted).)  Defendants' motion contains no citations to cases and no other argument as to why the information should be kept from the public.

This is yet another example of parties conflating the standards for protective orders, which concern secrecy within the discovery process, and orders to seal filings, which implicate the right of the public to access court records.  *Shane Grp.*, 825 F.3d at 305.  "The public has a strong interest in obtaining the information contained in the court record," which includes "an interest in ascertaining what evidence and records the District Court and this Court have relied upon in reaching our decisions."  *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1180–81 (6th Cir. 1983).

Because of this public interest, there is a "strong presumption in favor of openness."  *Id.* at 1179. The party seeking to seal a record carries the burden of overcoming this presumption, *Shane Grp.*, 825 F.3d at 305, and "[o]nly the most compelling reasons can justify non-disclosure of judicial records," *Knoxville News-Sentinel*, 723 F.2d at 476.  In *Shane Group*, we further elaborated on this standard:

> [T]he greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access. . . . And even where a party can show a compelling reason why certain documents or portions thereof should be sealed, the seal itself must be narrowly tailored to serve that reason. The proponent of sealing therefore must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations."

*Shane Grp.*, 825 F.3d at 305–06 (citation omitted) (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002)).

In this case, Defendants' argument for sealing Plaintiffs' filing is "brief, perfunctory, and patently inadequate." *Id.* at 306. This inadequacy is especially evident given the public interest in this case, which involves the critical work of a government agency and life-and-death consequences for a young child. *See, e.g.*, *Brown & Williamson*, 710 F.2d at 1179 ("Civil cases frequently involve issues crucial to the public—for example, discrimination, voting rights, antitrust issues, government regulation, bankruptcy, etc."). Indeed, Defendants' one-sentence argument—that the brief contains information designated as confidential under the protective order—is almost the exact same argument that was squarely rejected in *Shane Group*, which criticized the parties for offering "protective-order justifications, not sealing-order ones." 825 F.3d at 306. Even under the terms of the protective order itself (which has no power to bind this Court or to affect what documents are available to the public), court approval is still required for documents to be maintained under seal, regardless of whether a party has designated them as confidential.

Furthermore, even if some degree of sealing were justified in this case (and it is not), the remedy Defendants seek—the complete sealing of Plaintiffs' brief—is not "narrowly tailored to serve" their need for secrecy. *Shane Grp.*, 825 F.3d at 305. Defendants' motion includes a table that purports to list all the examples of confidential information found in Plaintiffs' brief, but that table only lists four pages that contain possibly offending information. When the information at issue is limited to just four out of more than fifty pages, redaction—not sealing—is the answer.

Defendants' sole argument for sealing Plaintiffs' brief is that it contains information derived from a deposition that Defendants designated as confidential under a protective order. Under this Court's published precedent, this is plainly insufficient for a court filing to be sealed. Accordingly, Defendants' motion to seal is denied.

## V. CONCLUSION

While Plaintiffs' procedural due process claim and their claim under the custody exception to *DeShaney* must be dismissed, the same cannot be said for their state-created danger claim. Accordingly, we reverse the dismissal of Plaintiffs' substantive due process claim based on state-created danger arising from the interviews of Ta'Naejah in the presence of Crump and Owens, affirm the dismissal of the remainder of Plaintiffs' federal claims, vacate the dismissal of Plaintiffs' state-law claims, vacate the district court's order striking and denying Plaintiffs' Rule 59 motion, and remand this case for further proceedings consistent with this opinion. We also deny Defendants' motion to seal Plaintiffs' brief on appeal.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's disposition of all the issues here except for municipal liability.[1] First off, "[m]unicipalities may be held liable under § 1983 for constitutional violations committed by their employees if the violations result from municipal practices or policies." *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). But "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). I would have rested the failure of the municipal liability claim on the lack of any substantive due process right, had Defendants properly raised and argued the issue.

---

[1]I believe that Defendants have simply failed to argue at least two issues that I think they would have prevailed on. First, I don't believe that Plaintiffs have plausibly alleged the third prong of the state-created danger standard—whether the official acted with a culpable enough mental state. As we recently clarified, in resolving this third prong, we ask whether the defendant's actions were egregious enough to shock the conscience. *Doe v. Jackson Local Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933–34 (6th Cir. 2020). I don't believe that Plaintiffs met that burden. But Defendants have failed to explain that argument, in this Court or below. To be sure, the district court did not reject Plaintiffs' claim on this ground, but Defendants never gave it a chance.

I also believe that Defendants would likely be entitled to qualified immunity on the state-created danger issue because the law on whether a child can be interviewed with her alleged abuser present is not clearly established. *See Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) ("The rule's contours must be so well defined that it is clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity. We have repeatedly stressed that courts must not define clearly established law at a high level of generality[.]" (citations and quotation marks omitted)). It's true that a plaintiff must show that a right was clearly established to overcome qualified immunity once the defendant invokes it. *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019). But Defendants never questioned whether the law was clearly established on this particular point (even in the face of at least some caselaw that Plaintiffs cite as supposedly analogous to this case). And the district court did not decide the case below on this ground. So in this posture, Defendants should have made that argument to us.

In any case, the question here is whether Plaintiffs have plausibly alleged that a county custom or informal policy exists in the face of a formal, written policy to the contrary. In their complaint, Plaintiffs point to five or six instances of officials interviewing the same child—Ta'Naejah—in October 2016, February 2017, and March 2017. But we have concluded that "five instances of alleged misconduct, over three months, all involving the plaintiff himself is not enough to prove a custom." *Payne v. Sevier County*, 681 F. App'x 443, 447 (6th Cir. 2017) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 433–34 (6th Cir. 2005)).**2** The plaintiff must "reach beyond" his own situation and cannot "solely . . . point[] to the facts of his own case." *Id.* at 446 (quoting *Thomas*, 398 F.3d at 433–34). Pointing to a few sole instances involving the same person does not plausibly allege a custom "so persistent and widespread as to practically have the force of law." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

And the complaint contains no allegations that the county itself embraced this informal practice of a few employees violating the *written*, *formal* policy the county had. *See id.* at 387–89 (noting that municipal liability cannot occur under a *respondeat superior* theory and that "[m]unicipal liability attaches only where the policy or practice in question is 'attributable to the municipality'" (quoting *Heyerman v. County of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012))). Nor does the complaint contain allegations that the county was even aware of some of its employees ignoring its written, formal policy and that it then took no action to stop those

---

**2**That *Payne* is a summary judgment case does not change what a plaintiff needs to at least allege in a complaint first. What a plaintiff might find during discovery does not lessen her burden to plausibly allege the facts I describe. I also do not read the majority's conclusions to mean that, going forward, allegations of six instances regarding just the plaintiff will always suffice to overcome a motion to dismiss a municipal liability claim. Nor should they. Other circuits agree that allegations involving only "the events surrounding the plaintiff[]" do not get a complaint past the motion to dismiss stage, despite multiple officials participating in the alleged harm. *See, e.g.*, *Culbertson v. Lykos*, 790 F.3d 608, 628–29 (5th Cir. 2015).

employees' violations.**3** The complaint lacks any facts plausibly alleging a custom so ingrained that it supports a theory of municipal liability. I respectfully dissent on the issue.

---

**3**In that case—if Plaintiffs were alleging a custom of *inaction*—they would have had to allege much more than they did. To state a claim under such an inaction theory, Plaintiffs would have had to allege:

> (1) "a clear and persistent" pattern of unconstitutional conduct by municipal employees; (2) the municipality's "notice or constructive notice" of the unconstitutional conduct; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the municipality rather than simply by the conduct of the municipal employee.

*D'Ambrosio*, 747 F.3d at 387–88 (alterations in original) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

Plaintiffs failed to allege facts for these four elements. As mentioned, they excluded any allegations of a pattern because they only reference circumstances involving Ta'Naejah. They provide no facts at all suggesting that the municipality had notice or constructive notice of the officials actually interviewing Ta'Naejah in front of her caregivers rather than abide by the formal policy of not interviewing children in front of potential abusers. There are no facts that plausibly allege deliberate indifference to the way the individual Defendants conducted these interviews, and nothing suggests that any injury was caused by the municipality instead of the conduct of a few "bad apple[s]." *Id.* at 389 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985)).